# EXHIBIT N

to the Affidavit of Michael J. Pospis in Support of Johnson Electric Industrial Manufactory, Ltd. and Johnson Electric North America, Inc.'s Motion for Summary Judgment of Non-Infringement of U.S. Patent Nos. 6,166,462 and 6,439,843 and for Invalidity of U.S. Patent No. 6,695,580

**Westlaw.**

Slip Copy
Slip Copy, 2005 WL 2076561 (D.Conn.)
(Cite as: Slip Copy)

Page 1

H
Slip Copy, 2005 WL 2076561 (D.Conn.)
Only the Westlaw citation is currently available.
United States District Court,D. Connecticut.
JOHNSON ELECTRIC INDUSTRIAL
MANUFACTURING, LTD. and Johnson Electric
North America, Inc., Plaintiffs,
v.
AMETEK, INC., Defendant.
No. Civ.3:03CV0098(AVC).

Aug. 24, 2005.

Edmund J. Ferdinand, III , Grimes & Battersby , Norwalk, CT, Gregory J. Fleesler , Mark N. Parry , Stephen N. Weiss , Moses & Singer, New York, NY, for Plaintiffs.
Benjamin A. Solnit , Gerald T. Giaimo , Tyler, Cooper & Alcorn , New Haven, CT, Ray L. Weber , Renner, Kenner, Greive, Bobak, Taylor & Weber, Akron, OH, for Defendant.

RULING ON CLAIM CONSTRUCTION FOR '180 AND '843 PATENTS

COVELLO, J.
*1 This is an action for damages and equitable relief, brought pursuant to 35 U.S.C. § § 271 , 281. The plaintiffs, Johnson Electric Industrial Manufacturing, Ltd. and Johnson Electric North America, Inc. (collectively "Johnson") seek a declaratory judgment of noninfringement and invalidity regarding patents owned by the defendant, Ametek, Inc. ("Ametek"). Ametek cross claims that Johnson has infringed the same patents. FN1 The parties have requested that the court construe language in four claims of the patents in suit pursuant to the United States Supreme Court's holding in *Markman v. Westview Instru., Inc.*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). Specifically, the patents at issue here are United States Patent No. 6,309,180 (the " '180 patent") and United States Patent No. 6,439,843 (the " '843 patent").

FN1. Specifically, Johnson alleges, inter alia, that its current "through-flow motor" does not infringe on any valid claim in Ametek's U.S. Patent Nos. 5,734,214 , 6,309,180 , 6,166,462, or 6,439,843. In addition, Johnson alleges that Ametek's U.S. Patent Nos. 5,734,214 , 6,309,180 , 6,166,462 , and 6,439,843 are invalid. On the other hand, Ametek alleges, inter alia, that Johnson has infringed certain claims of Ametek's U.S. Patent Nos. 5,734,214 , 6,309,180 , 6,166,462 , 6,439,843 , and 6,695,580.

The issues presented are: (1) what is the meaning of "separated apart and disconnected from each other" in claim one, paragraph three, of the '180 patent ; (2) what is the meaning of "closely disposed about said outer periphery exhaust region" in claim one, paragraph five, of the '843 patent ; (3) what is the meaning of "gathering chamber" in claim eleven, paragraph six, of the '843 patent ; and (4) what is the meaning of "defining a gathering chamber" in claim seventeen, paragraph one, of the '843 patent. FN2

FN2. The parties' joint claim construction statement (document no.48) stated that the parties also disagreed as to the meaning of the phrase "wherein the height of each said curvilinear wall is significantly reduced prior to reaching said shaft aperture, thereby forming a flow chamber contiguous with said air chambers" in paragraph three of claim five of the '180 patent. The parties' respective opening claim construction briefs (document no.45 and 47), however, inform the court that the parties have agreed on a definition of this phrase. Specifically, the parties agree that the phrase means "the distance from the base to the top of each curvilinear wall is diminished by a fairly large amount before arriving at said shaft aperture, thereby developing an enclosed space accommodating movement sharing an edge or boundary with said air chambers." Because the parties have agreed on a construction of the phrase, the court need not construe the phrase.

For the reasons that hereinafter follow, the court concludes that within the meaning of these patents: (1) "separated apart and disconnected from each other" means "not joined to one another at their ends by any structural feature"; (2) "closely disposed about said outer periphery exhaust region" means

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:03-cv-00098-AVC    Document 64-14    Filed 05/01/2006    Page 3 of 16

Slip Copy
Slip Copy, 2005 WL 2076561 (D.Conn.)
(Cite as: Slip Copy)

Page 2

"placed near to the outside perimeter of the area of the fan where the working air is let out of the fan"; (3) "gathering chamber" means "space or cavity formed between the trailing ends of the vanes and the shroud wherein the trailing ends of the vanes are not positioned directly against the surface of the shroud"; and (4) "defining a gathering chamber" means "defining a space or cavity formed between the trailing ends of the vanes and the shroud wherein the trailing ends of the vanes are not positioned directly against the surface of the shroud."

FACTS

Examination of the complaint, patent records and supporting material discloses the following undisputed material facts:

Ametek is the owner of the '180 patent for a "Molded Through-Flow Motor Assembly" and the '843 patent for a "Motor/Fan Assembly Having a Radial Diffuser Bypass". The patents generally concern the structure of motors often used in vacuum cleaners.

The phrases in dispute describe a part of the motors that uses vanes FN3 to create passages for air to flow efficiently through the motors. The '180 patent refers to this part as the "diffuser plate." FN4 The '843 patent refers to this part as the "end bracket" which "includes diffuser plate functions and characteristics." The disputes concern the characteristics of the part's vanes and air passages.

FN3. The '180 and '843 patents use the term "vane." The parties have agreed in their joint claim construction statement (document no .48) that in the context of these patents "vane" means "blade." The patents also seem to use the term "curvilinear wall" to refer to a vane or blade.

FN4. The parties' joint claim construction statement (document no.48) defines the terms "diffuser/fan end bracket assembly" as "a group of parts comprising a structure with flow passages to decelerate a stream of air from a fan, and a structure receiving the fan, where a fan is a device for generating a current of air."

I. The '180 Patent

A. Claim 1: "separated apart and disconnected from each other."

*2 On August 18, 2000, Ametek filed a patent application (" '180 application) that would mature into the '180 patent. The United States Patent and Trademark Office ("USPTO") examiner initially rejected certain claims in the '180 application. Specifically, on March 6, 2001, the USPTO examiner rejected proposed claim six (issued claim one) as anticipated by an earlier patent, U.S. Patent No. 5,296,769 (the "Havens patent"). See Exhibit 2: Havens patent.

On June 14, 2001, Ametek responded to the examiner's rejection of the '180 application by distinguishing it from the Havens patent. Specifically, Ametek stated, in part, that in the Havens patent "[a]djacent vanes 36 are *connected* to one another near the center of air guide 25 at the corners 41. As such, the air flowing between the adjacent vanes is sharply re-directed by the corners 41" (emphasis added). See Exhibit 2: Havens patent. Furthermore, Ametek "believed that the turbulence generated by the corners [in the Havens patent] reduces the efficiency of the [Havens] motor and makes" the Havens motor "noisier."

Ametek requested that the USPTO allow Ametek to amend proposed claim six (issued claim one) of the '180 patent with an amendment,
> which sets forth that the curvilinear walls [in the '180 patent] are *separated apart and disconnected from each other*. In other words, the curvilinear walls are not joined to one another by virtue of a corner or other structural feature that extends from the second side of the main body portion. This feature is clearly not taught or suggested by the Havens reference nor does any of the prior art made of record provide such a feature with all the other claimed elements

(emphasis added).

Ametek also requested that the USPTO add the following paragraph to the specification of the proposed '180 patent:
> As best seen in Fig. 6, each curvilinear wall 77 *terminates at an end* prior to reaching the shaft aperture 81. The ends 79 and the radial transition of the bearing holder 78 form a flow chamber 83 therebetween. The flow chamber 83 is *contiguous* with all the air chambers 76 and functions to collect and redirect the air flow from a radial direction to an axial direction through the cup

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2005 WL 2076561 (D.Conn.)
(Cite as: Slip Copy)

Page 3

portion 19
(italics added; bold in original)). *See* Exhibit 1: '180 patent.

On October 30, 2001, four and a half months after Ametek submitted its amendments and remarks regarding the '180 application, the USPTO issued the '180 patent.

The issued '180 patent incorporated the phrase "separated apart and disconnected from each other" in issued claim one. The issued '180 patent also included the exact amendment to the specification which Ametek had suggested. *See* '180 patent, Cl.6, Ll.54-60 (claim one); '180 patent, Cl.5, Ll.6-12 (specification).

Specifically, claim one of the '180 patent claims, with disputed language italicized:
 A diffuser plate for diffusing air from a fan ... the diffuser plate comprising:
 *3 ....
 a plurality of curvilinear walls extending from said second side to define air chambers therebetween which are open to corresponding said inlet apertures, each said curvilinear wall extending from a corresponding curved wall toward but terminating prior to reaching said shaft aperture, and wherein said curvilinear walls *are separated apart and disconnected from each other.*
'180 patent (emphasis added). *See* Exhibit 1: '180 patent. The claim language in dispute is "separated apart and disconnected from each other."

II. The '843 Patent

A. Claim 1: "closely disposed about outer periphery exhaust region."

On November 16, 2000, three months after Ametek filed the '180 patent application, Ametek filed an application for another patent which would mature into the '843 patent.

On November 11, 2001, one year later, the USPTO examiner rejected proposed claim one (issued claim one) of the '843 patent application "as being anticipated by" U.S. Patent No. 6,166,462 (the "'462 patent"). Specifically, the examiner wrote that the prior art '462 patent anticipated the proposed '843 patent because the prior art '462 patent,
 shows a bypass motor assembly with a motor driving a shaft 12, a working air fan 32, a shroud 34, an end bracket 24 (part of the diffuser) with vanes to direct air from an intake eyelet 46 toward exhaust apertures 52 cut into the shell. A fan chamber is formed downstream of an outlet of the air fan 32 and upstream of the exhaust apertures 52. It is inherent that the vanes each have a leading end and a trailing end.
*See* Exhibit 4: '462 patent (bold in original).

On March 12, 2002, four months later, Ametek responded by distinguishing the '843 patent application from the '462 patent:
 A close review of the '462 patent clearly shows that the 'vanes' of that particular ['462 patent] diffuser are disposed in a plane below the bottom ring of the working air fan and nowhere near the outer periphery of the fan. In distinct contrast, the present invention ['843 patent application] now sets forth the vanes of the end bracket are *closely disposed about the outer periphery exhaust region* of the working air fan. This feature is clearly not taught or suggested by the '462 patent.
(emphasis added). Furthermore, Ametek requested that the USPTO amend proposed claim one (issued claim one) of the '843 patent application to include the phrase "wherein said plurality of vanes are closely disposed about said outer periphery exhaust region."

On August 27, 2002, five months after Ametek filed its amendments and remarks, the USPTO issued the '843 patent. The '843 patent included Ametek's addition of the phrase "wherein said plurality of vanes are closely disposed about said outer periphery exhaust region" in paragraph five of issued claim one. Specifically, issued claim one of the '843 patent claims:
 A bypass motor assembly, comprising:
 ....
 [an] end bracket having a plurality *of* vanes that form a fan chamber that receives said working air fan wherein said plurality of vanes are *closely disposed about said outer periphery exhaust region* such that air expelled by said working air fan is re-directed by said vanes toward said at least one exhaust aperture.
*4 '843 patent, Cl.7., Ll.27-32 (emphasis added). The claim language in dispute is "closely disposed about said outer periphery exhaust region."

B. Claim 17: "defining a gathering chamber."

On November 11, 2001, the USPTO examiner also rejected proposed claim eighteen (issued claim

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2005 WL 2076561 (D.Conn.)
(Cite as: Slip Copy)

Page 4

seventeen) of the '843 patent application. Specifically, the examiner rejected proposed claim eighteen (issued claim seventeen) as "anticipated by" Japanese Patent No. 6-123297 (the "Japanese patent").

The examiner rejected proposed claim eighteen (issued claim seventeen) "as anticipated" by the Japanese patent because the Japanese patent,

> shows a bracket for a bypass motor assembly, the bracket 2 having a base (the flat bottom part) with a periphery (the outer-most edge of the base), a shoulder (the side wall along the edge of the bracket to an outer edge of the bracket through the vanes and toward outlet holes on a shroud if a shroud with holes[] ] was present. The outer rim is where the outer edge of the base meets with the outer wall of the bracket. Each vane inherently includes a leading end and trailing end.

See Exhibit 5: Japanese patent.

On March 21, 2002, almost five months after the USPTO rejected proposed claim eighteen (issued claim seventeen), Ametek responded to the USPTO's rejection of the '843 application. With regard to proposed claim eighteen (issued claim seventeen), Ametek requested,

> entry of an amendment ... which sets forth that the outer rim of the bracket conjunction with the shroud forms *a gathering chamber* between the ends of the vanes and the shroud. Such feature is clearly not present in the [Japanese patent] inasmuch as the trailing ends of the vanes are positioned directly against the surface of the shroud [in the Japanese patent] and therefore *a gathering chamber* as defined in the present [proposed] claim [ eighteen (issued claim seventeen) of the '843 application] is simply not present [in the Japanese patent]. Therefore, it is respectfully submitted that dependent [proposed] claim 18 [issued claim seventeen] is allowable on its own merit.

(emphasis added).

Ametek also suggested amending proposed claim eighteen (issued claim seventeen), to include certain additional phrases. Specifically, Ametek suggested amending proposed claim eighteen (issued claim seventeen) to state that the bracket in the '843 patent application is comprised of, with added words italicized,

> an outer rim surrounding said shoulder and *adapted to support* the shroud, said plurality of vanes extending almost to said outer rim, each one of said plurality of vanes having a trailing end, said plurality of trailing ends *and the supported shroud* defining a gathering chamber *therebetween*

(emphasis added).

On August 27, 2002, the '843 patent issued. The examiner incorporated Ametek's amendments to proposed claim eighteen into issued claim seventeen. Consequently, claim seventeen of the '843 patent claims in full:

> *5 The bracket according to claim 16, further comprising:
> an outer rim surrounding said shoulder and adapted to support the shroud, said plurality of vanes extending almost to said outer rim, each one of said plurality of trailing ends and the supported shroud *defining a gathering chamber* therebetween.

'843 patent, Cl.10, Ll.13-20 (italics added; bold in original). See Exhibit 3: '843 patent. The disputed claim language is "defining a gathering chamber."

C. Claim 11: "gathering chamber."

On November 9, 2001, when the examiner rejected the '843 patent application, the examiner also wrote to Ametek that proposed claim ten (issued claim eleven) of the '843 patent application was "objected to as being dependent upon [a] rejected base claim ..." The examiner, however, noted that the claim "would be allowable if rewritten in independent form including all of the limitations of the base claim and any intervening claims."

On March 12, 2002, Ametek responded to the examiner's rejection. With respect to proposed claim ten (issued claim eleven), Ametek noted that it had "amended" proposed claim ten (issued claim eleven) "to incorporate the limitations of the originally filed claim 1 and as such" proposed claim ten (issued claim eleven) is "allowable ..."

Specifically, Ametek amended proposed claim ten (issued claim eleven) by adding an entirely new paragraph to the claim: paragraph six.

On August 27, 2002, the USPTO issued the '843 patent. Issued claim eleven includes the new paragraph six. Specifically, paragraph six of issued claim eleven claims a "bypass motor assembly",

> wherein said end bracket has a downwardly sloping shoulder and each said vane has a trailing end extending radially along said sloping shoulder, said trailing ends and said sloping shoulder form a *gathering chamber* therebetween where the working air collects prior to exiting from said at least one exhaust aperture.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:03-cv-00098-AVC    Document 64-14    Filed 05/01/2006    Page 6 of 16

Slip Copy
Slip Copy, 2005 WL 2076561 (D.Conn.)
(Cite as: Slip Copy)

Page 5

'843 patent, Cl.8, Ll.29-34 (emphasis added). The claim language in dispute is "gathering chamber."

## STANDARD

"It is elementary in patent law that, in determining whether a patent is ... infringed, the first step is to determine the meaning and scope of each claim in suit." _Lemelson v. Gen. Mills, Inc., 968 F.2d 1202 (Fed.Cir.1992)_. The process of determining what the words in a claim mean, commonly referred to as claim construction, is a question of law for the court. _Markman v. Westview Instru., Inc., 517 U.S. 370, 391, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996)_.

### I. Intrinsic Evidence: Claims, Specification, and Prosecution History

The intrinsic record is the court's "primary source for determining claim meaning." _C.R. Bard, Inc. v. U.S. Surgical Corp. ., 388 F.3d 858, 861 (Fed.Cir.2004)_. The intrinsic record consists of three sources: the patent's claims, FN5 the patent's specification, FN6 and the patent's prosecution history. FN7

> FN5. In the patent context, a claim is a "formal statement describing the novel features of an invention and defining the scope of the patent's protection." Black's Law Dictionary 241 (7th ed.1999).

> FN6. In the patent context, a specification is a "patent applicant's written description of how an invention is constructed and used." Black's Law Dictionary 1406 (7th ed.1999). "The specification contains a written description of the invention which must be clear and complete enough to enable those of ordinary skill in the art to make and use it." _Victronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed.Cir.1996)_.

> FN7. The prosecution history, or the file wrapper, "contains the complete record of all the proceedings before the Patent and Trademark Office, including any express representations made by the applicant regarding the scope of the claims." _Victronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1583 (Fed.Cir.1996)_.

To determine the meaning of disputed claim language, the court first examines the claim itself. See _ACTV, Inc. v. Walt Disney Co., 346 F.3d 1082, 1088 (Fed.Cir.2003)_ (noting "[f]irst and foremost, the analytical focus of claim construction must begin, and remain centered, on the language of the claims themselves"). The court must presume that unless there is "an express intent to impart a novel meaning to the claim terms, the words [in the claim] ... take on their ordinary and customary meanings attributed to them by those of ordinary skill in the art." _ACTV, Inc. v. Walt Disney Co., 346 F.3d 1082, 1088 (Fed.Cir.2003)_. See also _Astrazeneca AB, Aktiebolaget Hassle, KBI-E, Inc., et al. v. Mut. Pharm. Co., Inc., 384 F.3d 1333, 1337 (Fed.Cir.2004)_ (noting "the goal of claim construction is to determine what an ordinary artisan would deem the invention claimed by the patent ...").

*6 Prior to the Federal Circuit's recent ruling in _Phillips v. AWH Corp., 415 F.3d 1303, 2005 WL 1620331 (Fed.Cir. July 12, 2005)_, the Federal Circuit had instructed district courts to determine the "ordinary and customary meaning" of claim terms "by reviewing a variety of sources, including the claims themselves .... _dictionaries and treatises_ .... and the written description, the drawings, and the prosecution history." _ACTV, Inc. v. Walt Disney Co., 346 F.3d 1082, 1088 (Fed.Cir.2003)_ (emphasis added).

In _Phillips v. AWH Corp., 415 F.3d 1303, 2005 WL 1620331 (Fed.Cir. July 12, 2005)_, however, the Federal Circuit instructed district courts to restrain from first turning to dictionaries and treatises to define the customary and ordinary meaning of claim terms. The court reasoned that a dictionary-dependant method of determining the ordinary and customary meaning of claim terms places "too much reliance on extrinsic sources such as dictionaries ... and too little on intrinsic sources, in particular the specification and prosecution history." _Phillips v. AWH Corp., 415 F.3d 1303, 2005 WL 1620331, at *13 (Fed.Cir. July 12, 2005)_. The Federal Circuit held that courts must focus "at the outset on how the patentee used the claim term in the claims, specification, and prosecution history, rather than starting with a broad [dictionary] definition [of claim terms] and whittling [the dictionary definition] down." _Phillips v. AWH Corp., 415 F.3d 1303, 2005 WL 1620331, at *14 (Fed.Cir. July 12, 2005)_.

### A. Claims

### B. Specification

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2005 WL 2076561 (D.Conn.)
**(Cite as: Slip Copy)**

Page 6

The court must also interpret the claim term in the context of the patent's specification. A "person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." _Phillips v. AWH Corp._, 415 F.3d 1303, 2005 WL 1620331, at *5 (Fed.Cir. July 12, 2005).

As a general rule, "[t]he written description [in the specification] ... is not a substitute for, nor can it be used to rewrite, the chosen claim language." _Superguide Corp. v. DirectTV Enters., Inc._, 358 F.3d 870, 875 (Fed.Cir.2004). In other words, " 'Specifications teach. Claims claim.' " _Id._

The court must analyze the specification to determine if language in the specification rebuts the presumption that the claim terms have their ordinary and customary meaning. _ACTV, Inc. v. The Walt Disney Co._, 346 F.3d 1082, 1090-91 (Fed.Cir.2003). The presumption that the claim terms have their ordinary and customary meaning may be rebutted in either of two ways. First, the claim terms will not have their ordinary and customary meaning if the patent holder "acting as his or her lexicographer, has clearly set forth a definition of the term different from its ordinary or customary meaning." _ACTV, Inc. v. The Walt Disney Co._, 346 F.3d 1082, 1091 (Fed.Cir.2003). Second, the claim terms will not have their ordinary and customary meaning if the "inventor has disavowed or disclaimed [the claim's] scope of coverage, by using words or expressions of manifest exclusion or restriction, representing clear disavowal of claim scope." _Id. See also Phillips v. AWH Corp._, 415 F.3d 1303, 2005 WL 1620331, at *8 (Fed.Cir. July 12, 2005).

C. Prosecution History

*7 In addition to considering the patent's claim and specification as intrinsic evidence, the Federal Circuit has held that a court "should also consider the patent's prosecution history" in defining claim scope. _Phillips v. AWH Corp._, 415 F.3d 1303, 2005 WL 1620331, at *9 (Fed.Cir. July 12, 2005) (internal quotation marks and citation omitted).

The prosecution history is the third type of intrinsic evidence consisting of "the complete record of the proceedings before the [USPTO] and includes the prior art cited during the examination of the patent." _Id._ at *9. The court defines claim terms in the context of the prosecution history because it "constitutes a public record of the patentee's representations concerning the scope and meaning of the claims ..." _Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc._, 222 F.3d 951, 957 (Fed.Cir.2000). _See also Victronics Corp. v. Conceptronic, Inc._, 90 F.3d 1576, 1583 (Fed.Cir.1996) (noting that the claims, specification, and prosecution history "constitute the public record of the patentee's claim, a record on which the public is entitled to rely").

Furthermore, like the court's review of the specification, the court must examine the prosecution history to determine whether the patent holder (1) "intended to deviate from a term's ordinary and customary meaning," or (2) "disclaimed or disavowed subject matter, narrowing the scope of the claim terms." _ACTV, Inc. v. The Walt Disney Co._, 346 F.3d 1082, 1091 (Fed.Cir.2003). _See also Phillips v. AWH Corp._, 415 F.3d 1303, 2005 WL 1620331, at *9 (Fed.Cir. July 12, 2005) (recognizing "the prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention in the course of prosecution, making the claim scope narrower than it would be otherwise").

III. Extrinsic Evidence

If intrinsic evidence alone is not sufficient to define the claim terms, courts may use extrinsic evidence to define claim terms. In the patent context, extrinsic evidence is any "evidence outside the record before the United States Patent and Trademark Office ..." _Desper Prods., Inc. v. Qsound Labs, Inc._, 157 F.3d 1325, 1334 (Fed.Cir.1998). Specifically, extrinsic evidence includes expert testimony, dictionaries, and treatises. _Phillips v. AWH Corp._, 415 F.3d 1303, 2005 WL 1620331, at *10 (Fed.Cir. July 12, 2005). These examples of extrinsic evidence are "useful insofar as [they] 'can shed useful light on the relevant art-and thus better allow the court to place itself in the shoes of a person of ordinary skill in the art." ' _Astrazeneca AB, Aktiebolaget Hassle, KBI-E, Inc., et al. v. Mut. Pharm. Co., Inc._, 384 F.3d 1333, 1337 (Fed.Cir.2004) (quoting _Vanderlande Indus. Nederland BV v. Int'l Trade Comm'n_, 366 F.3d 1311, 1318 (Fed.Cir.2004)).

If, however, "intrinsic evidence unambiguously delineates the scope of the patent, resort to extrinsic evidence ... is unnecessary." _Phillips Petroleum Co. v. Huntsman Polymers Corp._, 157 F.3d 866, 870 (Fed.Cir.1998).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2005 WL 2076561 (D.Conn.)
(Cite as: Slip Copy)

Page 7

### IV. Written Description & Drawings

*8 Once the court has defined a disputed claim term using intrinsic evidence, and if necessary extrinsic evidence, the court must finally "examine the [patent's] written description and the drawings to confirm that the patentee's use of the disputed terms is consistent with the meaning given to it by the court." Rexnord Corp. v. The Laitram Corp., 274 F.3d 1336, 1342 (Fed.Cir.2001).

Nevertheless, a court cannot use either the patent's written descriptions or the patent's drawings to read limits into the meaning of a claim term. See Legget & Platt, Inc. v. Hickory Springs Mfg. Co., 285 F.3d 1353, 1357 (Fed.Cir.2002). Likewise, a court cannot use either the patent's written description or the patent's drawings to expand the terms of a claim to include inventions that are incongruous with the ordinary meaning of a claim. See Novo Nordisk of N. Amer., Inc. v. Genentech, 77 F.3d 1364, 1369 (Fed.Cir.1996).

### DISCUSSION

#### I. The '180 Patent

##### A. Claim 1: "separated apart and disconnected from each other"

The first dispute concerns a phrase in paragraph three of claim one of the '180 patent, which states that "the diffuser plate" is comprised of, inter alia:
> a plurality of curvilinear walls extending from said second side to define air chambers therebetween which are open to corresponding said air inlet apertures, each said curvilinear wall extending from a corresponding curved wall toward, but terminating prior to reaching said shaft aperture, and wherein said curvilinear walls are *separated apart and disconnected from each other.*

'180 patent, Cl.6, Ll.54-60 (emphasis added). See Exhibit 1: '180 patent. The phrase in dispute is "separated apart and disconnected from each other."

Johnson argues that "separated apart and disconnected from each other" means "not joined to one another by virtue of a corner or other structural feature that extends from the second side of the main body portion." Johnson supports this definition with two arguments. First, Johnson argues that the prosecution history reveals that Ametek acted as its own lexicographer and clearly set forth this explicit definition for the disputed claim language. Specifically, Johnson argues that its proposed definition is "the exact one given by" Ametek "and their counsel during the prosecution of the '180 patent." Second, Johnson argues that Ametek disavowed the ordinary scope of the disputed claim language "by amending the claim and expressly distinguishing it from the Havens patent ..."

Ametek responds, first, that Johnson's proposed definition is an attempt to "improperly read an extraneous limitation into the claim with reference to the accused product in a veiled attempt to avoid infringement." Second, Ametek responds that Johnson's definition has "no basis in the claim ... specification or drawing."

Instead, Ametek argues that the court should give "separated apart and disconnected from each other" its dictionary definition which is, according to Ametek, "set at a distance in place or position and individually divided."

*9 For the reasons set forth below, the court concludes Ametek used the disputed phrase, "separated apart and disconnected from each other", in the prosecution history and claims FN8 of the '180 patent to mean "not joined to one another at their ends by any structural feature."

> FN8. The specification does not use the disputed phrase. Accordingly, the court will not use the specification to define the disputed phrase.

##### A. Prosecution History

###### 1. Acting As One's Own Lexicographer

Johnson first argues that the prosecution history reveals that Ametek acted as its own lexicographer by defining the disputed claim language to mean "not joined to one another by virtue of a corner or other structural feature that extends from the second side of the main body portion." Ametek responds that it did not act as its own lexicographer. The court agrees with Ametek.

A patent applicant can act as its own lexicographer by giving a claim term "a meaning 'inconsistent with

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2005 WL 2076561 (D.Conn.)
(Cite as: Slip Copy)

Page 8

its ordinary meaning" '. *Merck & Co., Inc. v. Teva Pharm. USA, Inc.,* 395 F.3d 1364, 1378 (Fed.Cir.2005). However an applicant seeking to give a claim term a meaning other than its ordinary meaning must do so "with reasonable clarity, deliberateness, and precision .... so as to give one of ordinary skill in the art notice of the change." *In re Paulsen,* 30 F.3d 1475, 1480 (Fed.Cir.1994) (concluding the "patent does not clearly redefine the term 'computer' such that one of ordinary skill in the art would deem it to be different from its common meaning"). See also *Merck & Co., Inc. v. Teva Pharms. USA, Inc.,* 395 F.3d 1364, 1370 (Fed.Cir.2005)(noting "[t]he Federal Circuit has repeatedly emphasized that the statement in the specification must have sufficient clarity to put one reasonably skilled in the art on notice that the inventor intended to redefine the claim term").

For example, in *Merck & Co., Inc. v. Teva Pharms. USA, Inc.,* 395 F.3d 1364 (Fed.Cir.2005), the Federal Circuit concluded that a district court had erred when it concluded that a patentee had acted as its own lexicographer. Specifically, the Federal Circuit reasoned that the "the passage" that the district court had relied on was "ambiguous" and "amenable to a second (and more reasonable) interpretation". *Id.* at 1370-71. As such, the patentee's statement did not amount to the patentee "clearly set[ting] out its own definition with 'reasonable clarity, deliberateness, and precision." ' *Id.* at 1371.

Johnson argues that Ametek acted as its own lexicographer when it wrote to the USPTO and distinguished the Havens patent from the '180 patent. Specifically, Ametek requested an amendment to the '180 patent,
> which sets forth that the curvilinear walls [in the '180 patent] are *separated apart and disconnected from each other.* In other words, the curvilinear walls are not joined to one another by virtue of a corner or other structural feature that extends from the second side of the main body portion.

(emphasis added). Ametek argues that in the second sentence of this excerpt, Ametek was simply describing the differences between the prior art and the '180 patent. Ametek argues that it was not providing a new definition for the phrase "separated apart and disconnected from eachother."

*10 The court concludes that at the very least the excerpt is ambiguous. To act as one's own lexicographer, the patent applicant must provide a new definition of the disputed phrase with deliberateness, precision, and clarity. The prosecution history of the '180 patent lacks such a deliberate, precise or clear attempt by Ametek to invoke its power to act as its own lexicographer. Accordingly, the court concludes that Ametek did not act as its own lexicographer with respect to the phrase "separated apart and disconnected from each other."

2. Disavowal of Claim Scope

Johnson next argues that during the prosecution of the '180 patent, Ametek disavowed the full scope of meaning that the disputed claim language would otherwise have. Ametek argues that it did not disavow any claim scope. The court concludes that Ametek partially disavowed the scope that the disputed phrase would otherwise have.

A patent's prosecution history "may demonstrate that the patentee intended to deviate from a term's ordinary and accustomed meaning" by showing that "the applicant characterized the invention using words or expressions of manifest exclusion or restriction" before the USPTO. *Teleflex, Inc. v. Ficosa N. Amer. Corp.,* 299 F.3d 1313, 1326 (Fed.Cir.2002). Examination of a prosecution history will "limit[ ] the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution." *Southwall Techs., Inc. v. Cardinal IG Co.,* 54 F.3d 1570, 1576 (Fed.Cir.1995). In other words, "[c]laims may not be construed one way in order to obtain their allowance and in a different way against accused infringers." *Southwall Techs., Inc. v. Cardinal IG Co.,* 54 F.3d 1570, 1576 (Fed.Cir.1995).

The prosecution history of the '180 patent reveals that Ametek added the phrase "separated apart and disconnected from each other" to claim one of the '180 patent in an apparent attempt to distinguish the '180 patent from the Havens patent. Ametek described the Havens patent to the USPTO examiner as having "[a]djacent vanes [which] are *connected to one another near the center of air guide* 25 at the corners 41. As such, the air flowing between the adjacent vanes is sharply re-directed by the corners 41" (emphasis added). *See* Exhibit 2: Havens patent. In other words, Ametek pointed out to the USPTO that in the Havens patent the ends of the curvilinear walls were "connected to one another" so that when the air flowed between the curvilinear walls inward the air stopped at the connected ends of the curvilinear walls. Therefore, the air in Havens never reached the opening that ran axially through the center of the diffuser plate.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:03-cv-00098-AVC   Document 64-14   Filed 05/01/2006   Page 10 of 16

Slip Copy
Slip Copy, 2005 WL 2076561 (D.Conn.)
(Cite as: Slip Copy)

Page 9

After pointing out the problems with the Havens patent, Ametek requested an amendment that would clarify the differences between the '180 patent application and the Havens patent. Specifically, Ametek proposed an amendment to proposed claim six (issued claim one) that

> sets forth that the curvilinear walls [in the '180 patent] are *separated apart and disconnected from each other*. In other words, the curvilinear walls are not joined to one another by virtue of a corner or other structural feature that extends from the second side of the main body portion. This feature is clearly not taught or suggested by the Havens reference nor does any of the prior art made of record provide such a feature with all the other claimed elements

*11 (emphasis added).

Ametek emphasized to the examiner that one distinguishing feature of the '180 patent application was that because the curvilinear walls were "separated apart and disconnected from each other" air could flow between the curvilinear walls radially inward, and then into the air chamber running axially through the diffuser. The examiner accepted the amendment, added the phrase in dispute to claim one, and issued the '180 patent.

The court concludes that Ametek's statements to the USPTO constituted a partial disavowal of claim scope. Ametek used the phrase "separated apart and disconnected from each other" in writing to the examiner to emphasize that in contrast to the Havens patent, the '180 patent had no structural feature blocking the air from flowing inward between the curvilinear walls and into the axial chamber.

The court has not fully adopted the definition of the phrase that Johnson urges. Johnson argues that the meaning of the disputed phrase is "not joined to one another by *virtue of a corner* or other structural feature *that extends from the second side of the main body portion*" (emphasis added). Johnson derives this definition from the sentence in the prosecution history in which Ametek states: "In other words, the curvilinear walls are not joined to one another by virtue of a corner or other structural feature that extends from the second side of the main body portion."

The court, however, concludes that reading the full prosecution history reveals that Ametek focused during the prosecution on the fact that the '180 patent's curvilinear walls are not joined at their ends *at all;* the prosecution history does not focus on the '180 patent's curvilinear walls not being joined by *specific* "structural feature[s] that extend[ ] from the second side of the main body portion." Rather, the court concludes Ametek used the words "structural feature[s] that extend[ ] from the second side of the main body portion" in writing to the examiner to specifically describe the Havens patent. Ametek's statements to the examiner did not limit the '180 patent's scope to a diffuser plate with curvilinear walls that are not joined by a *particular kind* of structural feature. The statements limited the '180 patent's scope to a diffuser plate with curvilinear walls that are not joined *at all*. Therefore, the court construes the disputed claim language to mean "not joined to one another at their ends by any structural feature."

B. Claim Language

The court's construction of the disputed phrase is consistent with how Ametek used the phrase in the claim itself. *Desper Prods., Inc. v. Qsound Labs, Inc., 157 F.3d 1325, 1334 (Fed.Cir.1998)*. The Federal Circuit has held that "[w]hile certain claim terms may be at the center of the claim construction debate, the context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those terms." *ACTV, Inc. v. Walt Disney Co., 346 F.3d 1082, 1088 (Fed.Cir.2003)*. Here, the context of the words surrounding the disputed phrase shows that the disputed phrase means "not joined to one another at their ends by any structural feature."

*12 The relevant paragraph of claim one of the '180 patent states that "the diffuser plate" is comprised of, inter alia:

> a plurality of curvilinear walls extending from said second side to define air chambers therebetween which are open to corresponding said air inlet apertures, each said curvilinear wall extending from a corresponding curved wall toward, but terminating prior to reaching said shaft aperture, and wherein said curvilinear walls are *separated apart and disconnected from each other*.

Overall, this claim language describes that the curvilinear walls extend from the second side of the diffuser plate and create "air chambers," or "boundaries of space or cavit[ies] of air," FN9 between the curvilinear walls. Each curvilinear wall "ends before arriving at" FN10 the "shaft aperture", or opening, that runs through the center of the diffuser. Construing the disputed claim language "separated apart and disconnected from each other"

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:03-cv-00098-AVC   Document 64-14   Filed 05/01/2006   Page 11 of 16

Slip Copy
Slip Copy, 2005 WL 2076561 (D.Conn.)
(Cite as: Slip Copy)

Page 10

to mean "not joined to one another at their ends by any structural feature" fits within the context of the claim because it describes a feature of the vanes that allows the air to flow freely into the axial chamber.

FN9. The parties have agreed to this definition of "air chambers" in their joint claim construction statement.

FN10. The parties have agreed that "terminating prior to reaching" means "ending before arriving at" in their joint claim construction statement.

C. Drawings FN11

FN11. Because the court has concluded that it can determine the meaning of the disputed terms through examination of the intrinsic evidence, the court need not turn to extrinsic evidence. See Phillips Petroleum Co. v. Huntsman Polymers Corp., 157 F.3d 866, 870 (Fed.Cir.1998) (noting if "intrinsic evidence unambiguously delineates the scope of the patent, resort to extrinsic evidence ... is unnecessary").

The drawings confirm that Ametek's use of the disputed terms was consistent with the meaning that the court has given the terms. In the drawings, the vanes are "not joined to one another at their ends by any structural feature" thereby allowing air to flow between the vanes and directly into the central axial chamber. See Exhibit 1: '180 patent.

II. The '843 Patent

A. Claim 1: "closely disposed about said outer periphery exhaust region"

The parties next dispute the construction of a phrase in paragraph five of claim one of the '843 patent: "closely disposed about said outer periphery exhaust region."

Johnson argues that "closely disposed about said outer periphery exhaust region" means "near and on the same plane as the outer boundary of the fan." Johnson argues that during the prosecution of the '843 patent, Ametek "disclaimed the distinguished structure" of the prior art and thereby disavowed the full meaning which the disputed claim language would ordinarily have.

Ametek responds first that Johnson's proposed definition "reads extraneous limitations from the specification into the claim." Ametek next responds that Johnson's proposed definition is improper because the "claim term at issue address[es] only proximity to the outerperiphery exhaust region, and is totally silent as to any planer relationship."

Instead, Ametek argues that "closely disposed about said outer periphery exhaust region" means "placed near and all around the outside perimeter of the area where the air is let out." Specifically, Ametek argues that this definition is proper because it gives the disputed phrase its "ordinary and customary meaning" and is "consistent with the specification and drawings of the '843 patent."

*13 The court agrees with Ametek that Ametek did not disavow claim scope. Specifically, the court concludes that in the context of claim one paragraph five of the '843 patent, the phrase "closely disposed about said outer periphery exhaust region" means "placed near to the outside perimeter of the area of the fan where the working air is let out of the fan." FN12

FN12. The court has adopted Ametek's proposed construction of the disputed claim term with certain modifications. Ametek argued that the phrase means "placed near and all around the outside perimeter where the air is let out." The court construes the phrase to mean "placed near to the outside perimeter of the area of the fan where the working air is let out of the fan."

1. Claim Language

The court will first analyze how claim one of the '843 patent uses the phrase "closely disposed about said outer periphery exhaust region." Claim one of the '843 patent claims a "bypass motor assembly" containing, inter alia, with disputed language in italics,
[an] end bracket having a plurality of vanes [blades] that form a fan chamber that receives said working air fan wherein said plurality of vanes [blades] are *closely disposed about said outer periphery exhaust region* such that air expelled by said working air fan is re-directed by said vanes [blades] toward at least one exhaust aperture.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:03-cv-00098-AVC   Document 64-14   Filed 05/01/2006   Page 12 of 16

Slip Copy
Slip Copy, 2005 WL 2076561 (D.Conn.)
(Cite as: Slip Copy)

Page 11

'843 patent, Cl.7, Ll.27-32 (emphasis added). This claim language describes how the working air fan (26) and the diffuser end bracket (24) function together in the '843 patent. First, the fan (26) expels air used by the motor, working air, through the fan's exhaust region (86). Next, the vanes (52) of the diffuser end bracket (24) re-direct the air toward the diffuser's "exhaust aperture[s]". See Exhibit 3: '843 patent.

The phrase "closely disposed about said outer periphery exhaust region" describes the placement of the vanes (52) in relation to the exhaust region (86) of the fan (26). The closeness of the vanes to the fan's exhaust region allows the "air expelled by" the "working air fan" to be "re-directed by said vanes toward at least one exhaust aperture" so that the air can flow out of the diffuser end bracket (24).

The court's construction of the disputed phrase reflects the way in which the claim uses the disputed language. It is the vane's "placement near to the outside perimeter of the area of fan where the working air is let out of the fan" that allows the vanes to re-direct the working air to the exhaust apertures. Furthermore, in contrast to Johnson's proposed definition, the claim is notably silent as to the planer relationship between the vanes and the exhaust region.

2. Specification

The specification supports the court's construction of the disputed language. The specification recites language similar to the disputed claim language:
> The leading ends 56 of the vanes 52 are *disposed closely about the outer periphery of the fan 26 around the exhaust region 86.* Indeed, each vane 52 has a top edge 54 which is of such a height so as to be equivalent to or larger than the height of the exhaust region 86. Accordingly, almost as soon as the working air is expelled from the fan exhaust ports 84, it is deflected and captured by the leading ends 56 and received in the channels 64 formed by the adjacent vanes 52 and the shroud 94.

*14 '843 patent, Cl.5-6, Ll. 60-1 (emphasis added). See Exhibit 3: '843 patent. It is because the vanes are "disposed closely about the outer periphery" of the exhaust region, with "each vane" having a "top edge 54 which is ... equivalent or larger that the height of the [fan's] exhaust region," that the air can flow from the fan, between the vanes, and out the exhaust openings.

In contrast to Johnson's proposed definition, the specification, like the claim, is silent about the planer relationship between the vanes and the fan's exhaust region. The court finds "nothing in the written description of the ['843] patent, much less the claim language" that dictates that the vanes must be located on the same plane as the fan's exhaust region. *Superguide Corp. v. DirectTV Enters., Inc.,* 358 F.3d 870, 880 (Fed.Cir.2004).

3. Prosecution History: Disavowal of Claim Scope

Johnson, however, argues that the prosecution history reveals that Ametek disavowed the full meaning of the disputed claim language and thereby limited the definition of "closely disposed about said outer periphery exhaust region" to mean "near and on the same plane as the outer boundary of the fan." Ametek argues that it did not disavow claim scope and the court agrees.

A patent's prosecution history may, in some instances, reveal that the patent holder "disclaimed or disavowed subject matter" thereby "narrowing the scope of claim terms." *Superguide Corp. v. DirectTV Enters., Inc.,* 358 F.3d 870 (Fed.Cir.2004) (quoting *ACTV, Inc. v. Walt Disney Co.,* 346 F.3d 1082, 1091 (Fed.Cir.2003)). In *Superguide Corp. v. DirectTV Enters., Inc.,* 358 F.3d 870 (Fed.Cir.2004), the Federal Circuit noted, however, that a "prosecution history may not be used to infer the intentional narrowing of a claim absent the applicant's clear disavowal of claim coverage." *Superguide Corp. v. DirectTV Enters., Inc.,* 358 F.3d 870, 875 (Fed.Cir.2004) )(quoting *Amgen Inc. v. Hoechst Marion Roussel Inc.,* 314 F.3d 1313, 1327 (Fed.Cir.2003)). In other words, a disavowal of claim coverage "must be made with reasonable clarity and deliberateness." *Superguide Corp. v. DirectTV Enters., Inc.,* 358 F.3d 870, 875 (Fed.Cir.2004) (quotation marks and citation omitted).

On March 12, 2002, Ametek wrote to the USPTO in an apparent attempt to distinguish the proposed '843 patent from the prior art:
> A close review of the '462 patent clearly shows that the 'vanes' of that particular ['462 patent] diffuser are disposed in a plane below the bottom ring of the working air fan and nowhere near the outer periphery of the fan. In distinct contrast, the present invention ['843 patent application] now sets forth the vanes of the end bracket are *closely disposed about the outer periphery exhaust region of the working air fan.* This feature is clearly not

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:03-cv-00098-AVC   Document 64-14   Filed 05/01/2006   Page 13 of 16

Slip Copy
Slip Copy, 2005 WL 2076561 (D.Conn.)
(Cite as: Slip Copy)

Page 12

taught or suggested by the '462 patent (emphasis added). Ametek then requested that the USPTO amend proposed claim one (issued claim one) of the '843 patent application to add the phrase "wherein said plurality of vanes are closely disposed about said outer periphery exhaust region."

*15 In the initial sentence of Ametek's statement to the USPTO, Ametek described two characteristics of the vanes in the prior art '462 patent. First, the vanes in the '462 patent were located "in a plane below" the bottom ring of the working air fan. Second, the vanes in the '462 patent were located "nowhere near the outer periphery of the fan." Ametek then contrasted the '843 patent with the '462 patent by pointing out one characteristic of the '843 patent: the "vanes of the end bracket are closely disposed about the outer periphery exhaust region of the working air fan." Ametek made no statement about whether or not the vane and the working air fan were on the same plane in the '843 patent.

Johnson asks the court to infer from Ametek's use of the phrase "in distinct contrast" in the prosecution history, that Ametek meant to disclaim coverage of all products in which the vane and working air fan are not on the same plane. Analysis of Ametek's statement as a whole, however, reveals that Ametek did not clearly or deliberately disclaim coverage of products in which the vane and working air fan are not on the same plane. Rather, Ametek described two characteristics of the prior art: (1) planer location, and (2) proximity. Ametek then distinguished the '843 patent on the basis of only one of these characteristics: proximity. In light of this analysis, the court declines to conclude that Ametek deliberately disavowed the scope of the disputed claim language.

4. Drawings FN13

FN13. Because the court has concluded that it can determine the meaning of the disputed terms through examination of the intrinsic evidence, the court need not turn to extrinsic evidence. See *Phillips Petroleum Co. v. Huntsman Polymers Corp.*, 157 F.3d 866, 870 (Fed.Cir.1998)(noting if "intrinsic evidence unambiguously delineates the scope of the patent, resort to extrinsic evidence ... is unnecessary").

Finally, the court's construction of the disputed phrase is consistent with the '843 patent drawings.

See Exhibit 3: '843 patent. The drawings illustrate that the vanes (52) are located are "near the outside perimeter" of the fan's (26) exhaust region (86). See *Rexnord Corp. v. The Laitram Corp.*, 274 F.3d 1336, 1342 (Fed.Cir.2001).

B. Claim 11 and Claim 17: "Gathering Chamber"

The parties next dispute the meaning of the phrase "gathering chamber" in claims eleven and seventeen of the '843 patent. FN14

FN14. In claim seventeen of the '843 patent, the parties actually dispute the meaning of the phrase "defining a gathering chamber". In proposing definitions for the phrase "defining a gathering chamber", each party has combined its proposed construction of "gathering chamber" with a dictionary definition of "defining." Johnson, however, also argues that the " 'defining' needs no construction" because the parties' "proposed definitions" of defining "are not any plainer than the word 'defining' itself." The court agrees with Johnson. The Federal Circuit Court of Appeals has noted that courts "regularly forgo detailed dictionary analysis if the term is ... commonplace." *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 863 (Fed.Cir.2004). The court concludes that the term "defining" is commonplace and therefore the court can forgo a detailed analysis of "defining." The court will focus on interpreting the phrase "gathering chamber" as used in claims eleven and seventeen of the '843 patent. For claim seventeen, the court will add the word "defining" to the definition of "gathering chamber".

Johnson argues that "gathering chamber" means "the space or cavity formed between the trailing ends of the vanes and the shroud wherein the trailing ends of the vanes are not positioned directly against the surface of the shroud." Johnson supports this construction with two arguments. First, Johnson argues that the prosecution history reveals that Ametek "acted as his own lexicographer and provided [this] explicit definition for the term 'gathering chamber' ". Second, Johnson argues that Ametek disclaimed claim scope during the prosecution of the '843 patent "by amending the claim to state that the gathering chamber is formed

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2005 WL 2076561 (D.Conn.)
**(Cite as: Slip Copy)**

Page 13

specifically between the ends of the vanes and the shroud ... and by distinguishing the Japanese ... patent with respect to the configuration of the vanes and the shroud".

Ametek responds that Johnson's definition "adds extraneous limitations on the claims." Specifically, Ametek argues that Johnson's construction of gathering chamber "(1) totally ignore[s] the word 'gathering' " and (2) defines "the term 'chamber' as to its location and position, which are otherwise treated in the claim itself and not identified as requiring construction."

**\*16** Ametek instead argues that "gathering chamber" means "an enclosed space for accumulation of working air" and that this definition is "in accordance with common dictionary definitions, [and] consistent with the meaning adduced from the patent specification and drawings."

The court concludes that although Ametek did not act as its own lexicographer, Ametek did disavow claim scope in its negotiations with the USPTO examiner. Accordingly, the meaning of the disputed phrase is "the space or cavity formed between the trailing ends of the vanes and the shroud wherein the trailing ends of the vanes are not positioned directly against the surface of the shroud."

1. Prosecution History

a. Acting As One's Own Lexicographer

Johnson first argues that the prosecution history reveals that Ametek acted as its own lexicographer and defined "gathering chamber" to mean "the space or cavity formed between the trailing ends of the vanes and the shroud wherein the trailing ends of the vanes are not positioned directly against the surface of the shroud."

As noted earlier, a patent applicant can act as its own lexicographer during the prosecution of a patent by giving a claim term "a meaning 'inconsistent with its ordinary meaning' ". _Merck & Co., Inc. v. Teva Pharm. USA, Inc._, 395 F.3d 1364, 1378 (Fed.Cir.2005). The applicant seeking to give a claim term a meaning other than its ordinary meaning must do so "with reasonable clarity, deliberateness, and precision .... so as to give one of ordinary skill in the art notice of the change." _In re Paulsen_, 30 F.3d 1475, 1480 (Fed.Cir.1994)(concluding the "patent does not clearly redefine the term 'computer' such that one of ordinary skill in the art would deem it to be different from its common meaning").

The court concludes that the '843 patent does not clearly redefine the term "gathering chamber" such that one of ordinary skill in the art would deem it to have other than its ordinary meaning. Johnson points to Ametek's efforts to distinguish the '843 patent from the Japanese prior art as evidence that Ametek acted its own lexicographer by giving "gathering chamber" a definition different from its ordinary definition. However, a party seeking to redefine a claim term must do so with "reasonable clarity, deliberateness, and precision". _In re Paulsen_, 30 F.3d 1475, 1480 (Fed.Cir.1994). The court's review of the prosecution history reveals no clear, deliberate or precise attempt to give "gathering chamber" a specific definition other than its ordinary meaning.

b. Disavowal of Claim Scope

Johnson next argues that the prosecution history of the '843 patent reveals that Ametek narrowed the definition of "gathering chamber" by specifically disavowing claim scope. Specifically, Johnson argues that Ametek narrowed the scope of "gathering chamber" when it emphasized the differences between the '843 patent and the Japanese patent.

As explained earlier, a patent's prosecution history may, in some instances, reveal that the patent holder "disclaimed or disavowed subject matter", thereby "narrowing the scope of claim terms." _Superguide Corp. v. DirectTV Enters., Inc._, 358 F.3d 870 (Fed.Cir.2004) (quoting _ACTV, Inc. v. Walt Disney Co._, 346 F.3d 1082, 1091 (Fed.Cir.2003)). A patent applicant cannot construe a claim term "one way in order to obtain [its] allowance" before the USPTO and "in a different way against accused infringers." _Sputhwall Techs., Inc. v. Cardinal IG Co._, 54 F.3d 1570, 1576 (Fed.Cir.1995).

**\*17** After the USPTO examiner rejected the '843 patent as anticipated by the Japanese patent, Ametek requested permission to amend proposed claim eighteen (issued claim seventeen). Ametek requested "entry of an amendment ... which sets forth that the outer rim of the bracket conjunction with the shroud forms _a gathering chamber_ between the ends of the vanes and the shroud" (emphasis added). Ametek explained that the Japanese patent did not have a gathering chamber with these characteristics. Specifically, Ametek wrote to the USPTO,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:03-cv-00098-AVC   Document 64-14   Filed 05/01/2006   Page 15 of 16

Slip Copy
Slip Copy, 2005 WL 2076561 (D.Conn.)
(Cite as: Slip Copy)

Page 14

Such feature is clearly not present in the [Japanese patent] inasmuch as the trailing ends of the vanes are positioned directly against the surface of the shroud and therefore *a gathering chamber* as defined in the present [proposed] claim [eighteen (issued claim seventeen) of the '843 application] is simply not present [in the Japanese patent].

(emphasis added). In other words, according to Ametek's statements to the USPTO, the gathering chamber in the '843 patent was a specific type of gathering chamber which did not exist in the Japanese patent and could only exist where the "vanes are [not] positioned directly against the surface of the shroud".

The court concludes that in distinguishing the '843 patent from the Japanese patent on the basis of this specific type of gathering chamber, Ametek disavowed the ordinary scope that the term "gathering chamber" might otherwise have. Accordingly, the court adopts a definition of the "gathering chamber" that is in keeping with Ametek's statements to the USPTO: "space or cavity formed between the trailing ends of the vanes and the shroud wherein the trailing ends of the vanes are not positioned directly against the surface of the shroud."

Accordingly, (1) in claim eleven of the '843 patent "gathering chamber" means "space or cavity formed between the trailing ends of the vanes and the shroud wherein the trailing ends of the vanes are not positioned directly against the surface of the shroud", and (2) in claim seventeen of the '843 patent "defining a gathering chamber" means "defining a space or cavity formed between the trailing ends of the vanes and the shroud wherein the trailing ends of the vanes are not positioned directly against the surface of the shroud."

2. Claim Language

Defining "gathering chamber" as "a space or cavity formed between the trailing ends of the vanes and the shroud wherein the trailing ends of the vanes are not positioned directly against the surface of the shroud" is consistent with the way that the claims use the claim term.

Paragraph six of claim eleven states that the "bypass motor assembly" comprises, inter alia, an "end bracket" with

a downwardly sloping shoulder and each said vane [blade] has a trailing end extending radially along said sloping shoulder, said trailing ends and said shroud forming a *gathering chamber* therebetween where the working air collects prior to exiting from said at least one exhaust aperture.

*18 '843 patent, Col.8, Ll. 29-34 (emphasis added). Paragraph one of claim seventeen similarly states that the end bracket is comprised of,

an outer rim surrounding said shoulder and adapted to support the shroud, said plurality of vanes extending almost to said outer rim, each one of said plurality of vanes having a trailing end, said plurality of trailing ends and the supported shroud *defining a gathering chamber* therebetween.

'843 patent, Col. 10, Ll. 15-20 (emphasis added). The court's construction of the phrase fits is consistent with the way in which the claims describe the '843 patent.

3. Drawings FN15

FN15. Because the court has concluded that it can determine the meaning of the disputed terms through examination of the intrinsic evidence, the court need not turn to extrinsic evidence. See *Phillips Petroleum Co. v. Huntsman Polymers Corp.*, 157 F.3d 866, 870 (Fed.Cir.1998)(noting if "intrinsic evidence unambiguously delineates the scope of the patent, resort to extrinsic evidence ... is unnecessary").

Furthermore, the '843 patent drawings are consistent with this construction of the disputed claim term. Exhibit 3 illustrates that the gathering chamber (68) is the space between the sidewall of the shroud (96) and the trailing end (58) of the vanes (52). Furthermore, the trailing ends (58) of the vanes (52) "are not positioned directly against the surface of the shroud" (28). Accordingly, Ametek's "use of the disputed term[ ]" in the drawings "is consistent with the meaning given to [the term] by the court." *Rexnord Corp. v. The Laitram Corp.*, 274 F.3d 1336, 1342 (Fed.Cir.2001).

CONCLUSION

For the reasons that set forth above, the court concludes that within the meaning of these patents: (1) in claim one, paragraph three, of the '180 patent " separated apart and disconnected from each other" means "not joined to one another at their ends by any structural feature"; (2) in claim one, paragraph five, of the '843 patent " closely disposed about said outer

periphery exhaust region" means "placed near to the outside perimeter of the area of the fan where the working air is let out of the fan"; (3) in claim eleven, paragraph six, of the '843 patent " gathering chamber" means "a space or cavity formed between the trailing ends of the vanes and the shroud wherein the trailing ends of the vanes are not positioned directly against the surface of the shroud"; and (4) in claim seventeen, paragraph 1, of the '843 patent "defining a gathering chamber" means "defining a space or cavity formed between the trailing ends of the vanes and the shroud wherein the trailing ends of the vanes are not positioned directly against the surface of the shroud."

It is so ordered.

D.Conn.,2005.
Johnson Elec. Indus. Mfg., Ltd. v. Ametek, Inc.
Slip Copy, 2005 WL 2076561 (D.Conn.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.