# EXHIBIT 2

**to the Affidavit of Stephen N. Weiss in Support of Johnson Electric Industrial Manufactory, Ltd. and Johnson Electric North America, Inc.'s Motion for Summary Judgment With Respect to Ametek's Through-Flow Causes of Action, and Request for Attorney Fees Pursuant to 35 U.S.C. § 285 and 28 U.S.C. § 1927**

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JOHNSON ELECTRIC INDUSTRIAL :
MANUFACTORY, LTD. and :
JOHNSON ELECTRIC NORTH AMERICA, :
INC., :
    Plaintiffs, :
:
v. : Civil No: 3:03CV0098 (AVC)
:
:
AMETEK, INC., :
    Defendant. :

### RULING ON THE DEFENDANT'S MOTION TO DISMISS

This is an action seeking a declaratory judgment and equitable relief concerning the alleged invalidity and non-infringement of multiple patents. It is brought pursuant to 28 U.S.C. § 2201 and the patent laws of the United States, 35 U.S.C. §§ 102, 103, and 112. The defendant, Ametek, Inc., has filed the within motion to dismiss, arguing that this court lacks subject matter jurisdiction, or in the alternative, that this court should exercise its discretion and decline jurisdiction.

The issues presented are: 1) whether the court has subject matter jurisdiction over the case; and 2) if the court does have subject matter jurisdiction, whether it should exercise its discretion to decline jurisdiction.

For the reasons that hereafter follow, Ametek's motion to dismiss for lack of subject matter jurisdiction is denied.

### FACTS

Examination of the complaint, the motion to dismiss, the plaintiff's response to the motion to dismiss, the supporting affidavits, and other documents, discloses the following

1

undisputed material facts.

The plaintiff, Johnson Electric Industrial Manufactory, Ltd. ("JEI"), designs, markets, and manufactures motors for worldwide sale and distribution. The plaintiff, Johnson Electric North America, Inc. ("JENA"), is the sole distributor of JEI motors in the United States (collectively, the plaintiffs are referred to as "Johnson").

The defendant, Ametek, Inc., ("Ametek") has a large motor manufacturing division. Ametek and Johnson are the only significant suppliers of vacuum cleaner motors and operate competitively with each other in this market.

On March 31, 1998, U.S. Patent No. 5,734,214 (the "'214 patent") issued for Ametek's molded through-flow motor assembly. On August 18, 2000, Ametek attorney, Ray Weber, wrote a letter to James McCain, CEO of Oreck Manufacturing Company. This letter indicated that a flow-through motor provided to Oreck by Johnson for potential use in some of its vacuum cleaners may have fallen within the '214 patent. Weber concluded his letter to Oreck the following way:

> You have assured Ametek that Oreck honors the intellectual property rights of others. While Ametek welcomes fair competition, it cannot stand by as others simply copy the technology that it has developed at the expense of significant time and resources. We trust that you understand our position in this regard and that you will give the foregoing your thoughtful consideration.

On October 10, 2000, Ametek sued Johnson, alleging that the flow-through motor infringed one or more claims of Ametek's '214 patent. On July 30, 2001, Ametek and Johnson signed a patent license agreement resulting in the payment of royalties to Ametek by Johnson on its sales of the flow-through motor, and the suit was dismissed as settled. Since the 2001 patent license agreement, Johnson has redesigned its flow-through motor. The *new* flow-through motor, implicated in the present litigation, was in prototype

2

production at the time Johnson filed its complaint, and was scheduled to replace the *old* flow-through motor, already in production.

On August 21, 2002, Ametek's attorney, Ray Weber, wrote to Roger Baines, vice president of JENA, regarding the potential infringement of Johnson's bypass blower motor on Ametek's U.S. patent 6,166,462 (the "'462 patent"). This letter informed Baines, in relevant part:

> While we have not yet made a complete analysis of the applicability of our '462 patent to your blower motors, we are concerned that the substantial identity of structure and appearance between your motors and our patented motor suggests a strong likelihood of infringement.
>
> Our concern is heightened by the fact that you are apparently offering your copy of the AEROTEC motor in direct competition with Ametek. If, in fact, there is infringement, Ametek could be entitled to recover its lost profits on any sales you make, and those damages could be trebled for willful infringement ... Please be assured that we will aggressively pursue all necessary actions to protect Ametek's intellectual property rights.

On September 24, 2002, Weber wrote a second letter to Baines at Johnson, in which, among other things, he informed Baines of Ametek's recently issued U.S. Patent No. 6,439,843, a companion to the '462 patent. Weber also informed Baines that Johnson's bypass motor had been found on the market in Bissell Little Green Machine canister extractors. Weber closed this letter, "We trust that you will take this patent into consideration as we work toward resolving the by-pass motor issue."

Sometime during October 2002, an Ametek representative verbally informed the original equipment manufacturer ("OEM") for Bissell in Hong Kong, one of Johnson's customers, that the Johnson bypass motors in their canister extractors infringed Ametek patents, and that Ametek had confidence it could stop Johnson. The record indicates that Johnson did not learn of this communication until sometime after April 23, 2003, when an

3

e-mail communication between Philip Cheung and Joseph Meyer, two employees at the Bissell OEM, disclosed this information.

On November 11, 2002, Baines sent an e-mail to Ametek, requesting a meeting with Ametek and Ametek's legal advisors to discuss, among other topics, Johnson's new flow-through motor design, the by-pass motor designs sent by Ametek's patent counsel to Johnson, and "[f]inding a way to avoid any future infringements." Baines scheduled the meeting for December in order to ascertain Ametek's intentions when faced "with Johnson's adamant refusal to negotiate a license agreement on the patents now in issue."

On December 18, 2002, Baines, on behalf of Johnson, visited Ametek's offices in Ohio for a meeting with an Ametek president, two vice presidents, a manager, and a patent attorney. Accounts of this meeting differ between the two parties. Baines asserts that Ametek lawyer, Ray Weber, and Ametek president Albert Neupaver said, "Johnson was guilty of 'copying, stealing, and abusing' Ametek's engineering efforts and 'flagrantly infringing Ametek's patents'. [The meeting ended with Neupaver] making it crystal clear . . . that Ametek was about to sue us and/or our customers." After the meeting, Baines reported to Johnson headquarters and recommended that Johnson's customers be given hold-harmless agreements. On December 28, 2002, Baines sent an e-mail to Johnson's CEO, "Ametek made their intentions very clear to me they intend to sue, and the suit will become public in the near future . . . I will find out if any threats were made [to our customers] so that we have a foundation to go to court with."

Ametek president Neupaver asserts that "Ametek made no reference whatsoever to litigation nor to patent infringement in that meeting." Both parties agree, however, that no discussions concerning settlement occurred during this meeting. Baines informed the

4

Ametek representatives that Johnson believed the new flow-through and bypass blower motors manufactured by Johnson did not infringe on any of Ametek's patents. Ametek asserts in its brief, that it has still not fully assessed infringement regarding the bypass blower motor. Ametek did not take steps toward litigation after the meeting.

On January 13, 2003, Johnson filed a complaint in the U.S. District Court for the District of Connecticut seeking a declaratory judgment that the new design flow-through motor and bypass blower motor did not infringe on Ametek patents. On April 04, 2003, Ametek filed a motion to dismiss for lack of subject matter jurisdiction.

## STANDARD

In a Federal Rule of Civil Procedure 12 (b) (1) motion to dismiss for lack of jurisdiction over the subject matter, a district court should dismiss a case when it lacks the statutory or constitutional power to adjudicate it. Luckett v. Bure, 290 F.3d 493, 496 (2d Cir. 2002) (citing Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000)). Where a defendant challenges the court's subject matter jurisdiction by denying or refuting the allegations of jurisdiction in the complaint, a factual challenge exists, and the court may consider the pleadings as well as extrinsic evidence, including affidavits, to resolve the disputed factual issues. Cedars-Sinai Med. Ctr. v. Watkins, 11 F.3d 1573, 1583-84, (Fed. Cir. 1993). In matters implicating patent law, the law of the Federal Circuit applies. Shell Oil Co. v. Amoco Corp., 970 F.2d 885, 887 (Fed. Cir. 1992); Goodyear Tire & Rubber Co. v. Releasomers, Inc., 824 F.2d 953, 955 (Fed. Cir. 1987).

## DISCUSSION

### I. Subject Matter Jurisdiction

The defendant first argues that this court lacks subject matter jurisdiction over the

5

causes of action in the complaint because a case of actual controversy did not exist between the parties at the time Johnson filed its complaint. Specifically, the defendant argues that "[a] court has subject matter jurisdiction under 28 U.S.C. § 2201 only if a case of actual controversy existed between the parties at the time the complaint was filed"; and that "[n]o actual controversy existed between the parties at the time the [c]omplaint was filed as the parties had only initiated talks in order to determine if there existed a need for further licensing arrangements between them."

The plaintiff responds that "the [c]ourt has subject matter jurisdiction under the Declaratory Judgment Act", and "[a]s such, the complaint should not be dismissed." Specifically, the plaintiff argues that the "sole requirement under the [Declaratory Judgment] Act is that there be an actual controversy which is real and immediate between the parties." The plaintiff further urges "not only that Johnson had a reasonable apprehension of suit, but that Ametek's commencement of a patent infringement suit was imminent."

28 U.S.C. § 2201 (a), The Declaratory Judgment Act, states in relevant part, "In a case of *actual controversy* within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." (emphasis added) Under The Declaratory Judgment Act, "the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."

6

Arrowhead Indus. Water, Inc. v. Ecolochem, Inc., 846 F.2d 731, 735 (Fed. Cir. 1988) (quoting Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273 (U.S. 1941)). "The sole requirement for jurisdiction under the Act is that the conflict be real and immediate, i.e., that there be a true, actual 'controversy' required by the Act." Id. at 735.

In the patent context, an actual controversy arises when: 1) the defendant's conduct creates an objectively reasonable apprehension in the plaintiff that the defendant will initiate suit if the plaintiff continues the allegedly infringing activity, and 2) the plaintiff has produced or has prepared to produce the device. EMC Corp. v. Norand Corp., 89 F.3d 807, 811 (Fed. Cir. 1996); Goodyear Tire & Rubber Co. v. Releasomers, Inc., 824 F.2d 953, 955 (Fed. Cir. 1987).

The first prong of the Goodyear test examines whether Ametek's conduct created a reasonable apprehension in Johnson that Ametek would initiate suit if Johnson continued sell and develop its two motors.

"To constitute an actual controversy, the plaintiff has the burden of establishing by a preponderance of the evidence . . . that it has a reasonable apprehension that it will be sued." Shell Oil Co. v. Amoco Corp., 970 F.2d 885, 887 (Fed. Cir. 1992). The court must accept uncontroverted allegations as true, and all other allegations must be subjected to fact-finding by the court. Cedars-Sinai Med. Ctr. v. Watkins, 11 F.3d 1573, 1583-84, (Fed. Cir. 1993).

Without an express charge of infringement, the court must look at the "totality of the circumstances" to determine whether the defendant's conduct meets the first prong of this test. Arrowhead Indus. Water, Inc., 846 F.2d at 736. "The test . . . is objective and is

applied to the facts existing when the complaint is filed." Arrowhead Indus. Water, Inc. v. Ecolochem, Inc., 846 F.2d 731, 736 (Fed. Cir. 1988).

Whether there was an express charge of infringement or an express threat of suit remains in contention between the two parties and is therefore subject to fact-finding by the court. In support of its position that it possessed an objectively reasonable apprehension that Ametek would initiate suit at the time the complaint was filed, Johnson offers an affidavit from Roger Baines, vice president of JENA. The affidavit indicates that at the December meeting, Ametek lawyer, Ray Weber, and Ametek president Albert Neupaver said, "Johnson was guilty of 'copying, stealing, and abusing Ametek's engineering efforts and 'flagrantly infringing Ametek's patents'. [The meeting ended with Neupaver] making it crystal clear . . . that Ametek was about to sue us and/or our customers." An e-mail from Baines to Johnson's CEO after the December meeting further advances this contention: "Ametek made their intentions very clear to me they intend to sue." In that e-mail, Baines writes, "I will find out if any threats were made [to our customers] so that we have a foundation to go to court with." Nevertheless, if Ametek executives explicitly threatened suit against Johnson, Johnson already had the evidence necessary to commence a declaratory judgment action.

The affidavit of Ametek's president, Albert Neupaver, contradicts Baines's contentions. This affidavit indicates that: "Ametek made no reference whatsoever to litigation nor to patent infringement in that meeting."

Based on Baines' affidavit and the supporting e-mail evidence, the court finds that an express charge of infringement was made. However, assuming, arguendo, that there was not a charge of infringement, nor an explicit threat of suit, the totality of the

8

circumstances surrounding the two motors becomes increasingly relevant.

First, Johnson argues that based on past experience with Ametek, Johnson had a reasonable apprehension of suit in the instant case. In Goodyear Tire & Rubber Co. v. Releasomers, Inc., 824 F.2d 953 (Fed. Cir. 1987), the court concluded that an objective apprehension of an impending lawsuit for the infringement of two patents existed because "the parties have had a clear history of adverse legal interests as shown by ... ongoing state court action." Id. at 955-56. In the present case, the parties have a relatively recent history of contentious legal relations. Specifically, in 2000, Ametek sued Johnson for infringement of its '214 patent.

Second, there are parallels in the instant scenario that could have led Johnson to reasonable apprehension of an impending infringement suit. Namely, prior to the 2000 litigation, Ametek's attorney, Weber, sent a letter to one of Johnson's customers, Oreck, informing it of a *potential* patent infringement by one of Johnson's motors. Two months following this letter, Ametek filed suit against Johnson. Here, Johnson's vice president Baines received a letter of *potential* infringement from Attorney Weber. In the letter, dated August 21, 2002, Weber accused Johnson's bypass blower motor of *possibly* infringing on Ametek's '462 patent. The letter further stated, "Please be assured that we will aggressively pursue all necessary actions to protect Ametek's intellectual property rights." Since more than two months had passed between the receipt of this letter and the filing of the complaint, Johnson could have reasonably feared the imminent commencement of an infringement suit.

Finally, in the face of Weber's threatening infringement letter, Baines indicated in his affidavit that he scheduled a meeting for December 18, 2002 to ascertain Ametek's

9

intentions when faced "with Johnson's adamant refusal to negotiate a license agreement on the patents now in issue." The affidavits indicate that no negotiations, licensing or otherwise, took place at the December meeting. Baines, as planned, confronted Ametek representatives with Johnson's view that the bypass blower motor and new flow-through motor did not infringe on any Ametek patent. The meeting concluded without resolution of the matters in contention regarding the two motor designs.

The second prong of the Goodyear test requires that the "plaintiff . . . be engaged in an actual making, selling, or using activity subject to an infringement charge or must have made meaningful preparation for such activity." Arrowhead Indus. Water, Inc. v. Ecolochem, Inc., 846 F.2d 731, 736 (Fed. Cir. 1988). The record indicates that Johnson's bypass blower motor was in production sometime prior to September 24, 2002, when Ametek's attorney, Weber wrote to Johnson's vice president, Baines, indicating that the Johnson motor had been seen in a Bissell product which had been manufactured overseas. Thus, Johnson made and sold the bypass blower motor at the time Johnson filed the complaint.

Furthermore, the new flow-through motor, also satisfies the second prong of the Goodyear test. Johnson had made meaningful preparation for production of this motor at the time it filed the complaint. The *new* flow-through motor was in prototype production, and was scheduled to replace the *old* flow-through motor in production.

In view of the parties' prior litigation history, the August 21, 2002 letter, and the parties' failure to progress toward a resolution of the matter in their December 18, 2002 meeting, the court concludes that Johnson has proven by a preponderance of the evidence that its' apprehension of a patent infringement suit by Ametek was objectively reasonable

regarding the bypass blower motor and the new flow-through motor designs. Therefore, the defendant's motion to dismiss the complaint for lack of subject matter jurisdiction is denied.

## II. Discretion to Hear the Case

The defendant next argues that if the court determines it does possess subject matter jurisdiction because an actual controversy exists, it should exercise its discretion to decline jurisdiction. Specifically, the defendant argues that "Johnson proceeded with a suit as a negotiation ploy [and] . . . [s]uch procedural fencing should not be rewarded".

The plaintiff responds that if the court finds it does have subject matter jurisdiction over the case, it should use its discretion to grant jurisdiction in the matter. Specifically, the plaintiff argues "that Johnson started this action . . . to protect legitimate business interests, rather that to advance non-existent patent negotiations . . . [and therefore,] jurisdiction should be maintained. [Furthermore, plaintiff argues that] [a]cceptance of declaratory judgment jurisdiction becomes even more compelling in the case at bar in light of Ametek's tendency to involve Johnson's customers, [and that] [d]ismissal of this action would only encourage Ametek's attempts at 'extrajudicial patent enforcement.'"

In the presence of an actual controversy, a district court may use its discretion in deciding whether to exercise jurisdiction. <u>Goodyear Tire & Rubber Co. v. Releasomers, Inc.</u>, 824 F.2d 953, 955 (Fed. Cir. 1987). "[A]s long as the district court acts in accordance with the purposes of the Declaratory Judgment Act and the principles of sound judicial administration, the court has broad discretion to refuse to entertain a declaratory judgment action. It is appropriate, therefore, for a district court to examine whether hearing the declaratory judgment action would serve the objectives for which the

11

Declaratory Judgment Act was created." <u>EMC Corp. v. Norand Corp.</u>, 89 F.3d 807, 813-14 (Fed. Cir. 1996).

"The purpose of the [Declaratory Judgement] Act is to enable a person who is reasonably at legal risk because of an unresolved dispute, to obtain judicial resolution of that dispute without having to await the commencement of legal action by the other side. It accommodates the practical situation wherein the interests of one side to the dispute may be served by delay in taking legal action." <u>BP Chemicals Ltd. v. Union Carbide Corp.</u>, 4 F.3d 975, 977 (Fed. Cir. 1993). The Act should not be invoked if this would impede ongoing negotiations or allow patentees to improve their bargaining position by forcing their competitors to consider the practicalities of avoiding costly litigation. See <u>EMC Corp. v. Norand Corp.</u>, 89 F.3d 807, 810 (Fed. Cir. 1996).

The court has already determined that Johnson was at legal risk because of unresolved disputes over its two motors. Moreover, in the instant case, Johnson and Ametek were not actively negotiating. In the past, Johnson had negotiated with Ametek for a licensing arrangement in order to avoid the expenses of litigation. Without the protections afforded them by the Declaratory Judgment Act, Johnson will be forced to wait indefinitely in anticipation of a patent infringement suit by Ametek.

Delaying final determinations of infringement, while sending the message to Johnson's customers that production of the bypass blower motor could be stopped by Ametek, and threatening Johnson that, in the event that infringement was found, Ametek would "aggressively pursue all necessary actions to protect Ametek's intellectual property rights", all improved Ametek's bargaining position in the instant situation. Because of the uncertainty experienced by Johnson due to Ametek's actions, judicial resolution of the

matters is warranted.

For the aforementioned reasons, the court has determined it will exercise its discretion to hear the case.

## CONCLUSION

Based on all of the foregoing, the motion (#14) has been denied. It is so ordered, this 22nd day of July, 2003, at Hartford, Connecticut.

_____
Alfred V. Covello
United States District Judge