# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

-----------------------------------------------------------x
:
JOHNSON ELECTRIC INDUSTRIAL :
MANUFACTORY, LTD. and JOHNSON :
ELECTRIC NORTH AMERICA, INC., : CASE NO. 03CV0098AVC
:
                    Plaintiffs, :
:
     -against- :
:
AMETEK, INC., :
:
                    Defendant. :
:
-----------------------------------------------------------x

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF JOHNSON ELECTRIC INDUSTRIAL MANUFACTORY, LTD. AND JOHNSON ELECTRIC NORTH AMERICA, INC.'S MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT OF U.S. PATENT NOS. 6,166,462 AND 6,439,843 AND FOR INVALIDITY OF U.S. PATENT NO. 6,695,580**

Stephen Norman Weiss
(CT Fed. Bar No. CT 12717)
Gregory J. Fleesler
(CT Fed. Bar No. CT 24491)
MOSES & SINGER, LLP
The Chrysler Building
405 Lexington Avenue
New York, New York 10174
Tel.: (212) 554-7800
Fax: (212) 554-7700

*Attorneys for Plaintiffs/Counterclaim Defendants Johnson Electric Industrial Manufactory, Ltd. and Johnson Electric North America, Inc.*

the Japanese '699 patent (*see, supra,* at p. 18), and hence applying the doctrine of equivalents to the U66 or U82 Motor Assemblies would improperly ensnare the prior art.

### D. CLAIMS 1 AND 2 OF THE '580 PATENT ARE INVALID

Each feature of claims 1 and 2 of the '580 patent is disclosed in the Japanese '699 patent, as well as in the applicant's own '843 patent. Accordingly, the '580 patent is invalid under at least two theories: anticipation under 35 U.S.C. § 102, and obviousness-type double patenting.

#### 1. Anticipation

##### a. Legal Standard – Anticipation

Section 102 of Title 35 of the United States Code provides that "[a] person shall be entitled to a patent unless ... (b) the invention was patented or described in a printed publication in this or a foreign country ... more than one year prior to the date of the application for patent in the United States[.]" (35 U.S.C. § 102(b) (2006).)

As with infringement, the first step in an invalidity analysis is claim construction. (*Akamai Technologies, Inc. v. Cable & Wireless Internet Services, Inc.*, 344 F.3d 1186, 1192 (Fed. Cir. 2003).) The second step is determining whether a single prior art reference discloses each and every limitation of the properly construed claim, either expressly or inherently. (*Id.*) Thus, "[a] single prior art reference that discloses, either expressly or inherently, each limitation of a claim invalidates that claim by anticipation." (*Perricone v. Medicis Pharmaceutical Corp.*, 2005 WL 3468126, *5 (Fed. Cir. 2005); *Hazani v. U.S. Intern. Trade Comm'n*, 126 F.3d 1473, 1477 (Fed. Cir. 1997).) The "dispositive question regarding anticipation is whether one skilled in the art would reasonably understand or infer from the prior art reference's teaching that every claim limitation was disclosed in that single reference." (*Akamai*, 344 F.3d at 1192.) Under the principles of inherency, "if the prior art necessarily functions in accordance with, or includes, the claimed limitations, it anticipates." (*MEHL/Biophile Intern. Corp. v. Milgraum*, 192 F.3d 1362,

23

1365 (Fed. Cir. 1999); *see also, Akamai*, 344 F.3d at 1195 (finding inherent anticipation); *Tyler Refrigeration v. Kysor Industrial Corp.*, 777 F.2d 687, 689-90 (Fed. Cir. 1985) (same).)

    b.  **Claim 1 of the '580 Patent is Anticipated by the Japanese '699 Patent**

      (i)  **Text and Construction of Claim 1**

Claim 1, the only independent claim of the '580 patent, recites (with constructions underlined and substituted in place of the original claim language) a "bypass motor assembly, comprising ... a motor having a rotatable shaft; a working air fan secured to said rotatable shaft; a shroud having an intake eyelet and at least one exhaust aperture, and a

> support structure at an end of the motor having a shaft hole through which said rotatable shaft extends, said support structure at an end of the motor and said shroud surrounding to a degree said working air fan, wherein rotation of said working air fan draws air in through said intake eyelet and exhausts the air through said at least one exhaust aperture;
>
> said support structure at an end of the motor having a plurality of passageways that slope downward and outward away from said working air fan toward said at least one exhaust aperture, wherein said passageways extend from an inner periphery in a proper state of adjustment or in a straight line position with the outer periphery of said working air fan toward an outer periphery of said support structure at an end of the motor.[43]

      (ii)  **The Japanese '699 Patent Discloses Each Limitation of Claim 1**

The Japanese '699 patent, entitled "Electric Air Blower," was published on January 28, 1991,[44] and hence constitutes prior art under 35 U.S.C. § 102(b) with respect to the '580 patent. Generally, the Japanese '699 patent discloses "an electric air blower ... comprised of a motor, a

---

[43] '580 patent (Pospis Aff. Exh. E), at claim 1, col. 8:2-21; Joint Claim Construction Statement (Pospis Aff. Exh. M), at pp. 6, 9.

[44] *See,* the Japanese '699 patent translation (Pospis Aff. Exh. U), at p. 1.

centrifugal fan ..., a diffuser ..., and a fan cover, enclosing said centrifugal fan and said diffuser,"[45] and, as set forth in more particularity below, further teaches and discloses downwardly sloping air passageways formed by downwardly sloping ramps that lead from the end of the fan to the exhaust of the motor. Thus, the Japanese '699 patent discloses each limitation of claim 1, rendering claim 1 invalid under 35 U.S.C. § 102.

The *preamble* of claim 1 of the '580 patent provides for a "bypass motor assembly." (*Supra*, at p. 24.) The Japanese '699 patent likewise discloses a bypass motor assembly, as evidenced by its statement, in the section entitled "Industrial application field," that "[t]he present invention pertains to a so-called wet-type electric air blower that can suction air containing moisture."[46]

The *first and second paragraphs* of claim 1 of the '580 patent respectively provide for "a motor having a rotatable shaft" and "a working air fan secured to said rotatable shaft." (*Supra*, at p. 24.) The Japanese '699 patent discloses these limitations as it provides for a "centrifugal fan [that is] attached to the rotary shaft of [the] motor."[47] Moreover, the Japanese '699 patent states that "(15) represents a centrifugal fan attached to the end of said front rotary shaft (10)."[48]

The *third paragraph* of claim 1 of the '580 patent provides for "a shroud having an intake eyelet and at least one exhaust aperture." (*Supra*, at p. 24.) The Japanese '699 patent discloses this limitation, as it provides for a "fan cover [that] contains an air intake opening at the center and a plurality of air outlets on the side surface[.]"[49] Moreover, the Japanese '699 patent provides that "(19) represents a metal fan cover, which covers said centrifugal fan (15) and said

---

[45] *Id.*, at p. 3.

[46] *Id.*, at p. 2.

[47] *Id.*, at p. 3.

[48] *Id.*, at p. 4; *see also, id.*, at p. 6, Figure 1.

[49] *Id.*, at p. 3.

25

diffuser (18), and is attached to said motor frame (4). It has air intake (20) at the center, and a plurality of air outlets (22) arranged at prescribed intervals on peripheral side surface (21)."[50]

The *first clause of the fourth paragraph* of claim 1 of the '580 patent provides for "an end bracket having a shaft hole through which said rotatable shaft extends, said end bracket and said shroud partially enclosing said working air fan." (*Supra*, at p. 24.) The Japanese '699 patent discloses this limitation, as it provides for "a fan cover ... [that] enclose[es] [the] centrifugal fan and [the] diffuser"[51] and states that "(18) represents a disk-shaped diffuser, which is ... arranged between said centrifugal fan (15) and said motor (2)."[52] The "disk-shaped diffuser" of the Japanese '699 patent constitutes "an end bracket" within the meaning of claim 1 of the '580 patent, as it clearly constitutes a "support structure an end of the motor." The diffuser additionally has a "[b]earing hole (25)" formed through its central portion.[53] Because the diffuser of the Japanese '699 patent is "arranged between" the working air fan and the motor, it necessarily has a shaft hole through which the rotatable shaft extends. Moreover, the fan cover of the Japanese '699 patent "partially encloses" the diffuser and the motor, because it "surround[s]" those structures "to a degree."

The *second clause of the fourth paragraph* of claim 1 of the '580 patent provides that "rotation of said working air fan draws air in through [the] intake eyelet [of the shroud] and exhausts the air through said at least one exhaust aperture." (*Supra*, at p. 24.) The Japanese '699 patent discloses this limitation, as it provides that when "the motor drives the centrifugal fan to rotate at high speed ... [a]ir is drawn in from the air intake on the fan cover and is exhausted

---

[50] *Id.*, at p. 4; *see also, id.*, at p. 6, Figure 1.

[51] *Id.*, at p. 3

[52] *Id.*, at p. 4.

[53] *Id.*, at p. 4, and at p. 7, Figure 3A.

26

from the outer peripheral portion of the centrifugal fan in the radial direction ... and is exhausted from the air outlets."[54]

The *first clause of the fifth and final paragraph* of claim 1 of the '580 patent provides (with constructions underlined and substituted in place of the original claim language) that the "support structure at an end of the motor [has] a plurality of passageways that slope downward and outward away from said working air fan toward said at least one exhaust aperture." (*Supra*, at p. 24.) The Japanese '699 patent discloses this limitation, as it provides for a "diffuser [that] contains a plurality of inclined blades, which are at an angle from one side surface side to the other, at prescribed intervals with inclined passages formed between adjacent inclined blades that extend to said air outlets[.]"[55] In particular, the Japanese '699 patent provides that "[i]nclined passages (29) ... are formed between said adjacent inclined blades (28), (28)."[56] Furthermore, it provides that the "exhausted air flow passes ... through inclined passages (29) that form the spiral-shaped chambers and exit air outlets (22)," and that "[d]ue to the inclinations formed on the motor frame of the electric air blower of the present invention ..., the air exhausted from the centrifugal fan can flow in the path formed by the motor frame, diffuser, and fan cover without resistance."[57] Additionally, Figures 1 and 4 clearly show, by way of a dotted-line arrow, that the air flows through the inclined passages from the working air fan, and thereafter downward and outward away from the fan out of an exhaust aperture on the fan cover.[58] Since the purpose of the air passages (29) is to guide the air from the working air fan and out of the assembly through

---

[54] *Id.*, at p. 3.

[55] *Id.*, at p. 3.

[56] *Id.*, at p. 4, and at p. 6, Figure 1.

[57] *Id.*, at p. 5, and at p. 6, Figure 1.

[58] *Id.*, at p. 6, Figure 1, and at p. 8, Figure 4.

an outlet (22) on the fan cover (21), the inclined air passages of the Japanese '699 patent correspond to the downward- and outward-sloping passages of claim 1 of the '580 patent.

The *second clause of the fifth and final paragraph* of claim 1 of the '580 patent provides (with constructions underlined and substituted in place of the original claim language) that the "passageways extend from an inner periphery in a proper state of adjustment or in a straight line position with the outer periphery of said working air fan toward an outer periphery of said support structure at an end of the motor." (*Supra,* at p. 24.) Figures 3A and 3B of the Japanese '699 patent show that the passageways (29) extend, as in claim 1 of the '580 patent, "from an inner periphery in a proper state of adjustment or in a straight line position with the outer periphery of the working air fan toward an outer periphery of" the diffuser (18).[59]

Accordingly, each limitation of claim 1 of the '580 patent is disclosed by the Japanese '699 patent, and hence is anticipated and invalid.

    c.    **Claim 2 of the '580 Patent is Anticipated by the Japanese '699 Patent**

        (i)    **Text and Construction of Claim 2**

In addition to disclosing all steps of claim 1, claim 2 additionally sets forth (with constructions underlined and substituted in place of the original claim language) that the "passageways [of claim 1] gradually get larger as they approach at least one exhaust opening."[60] Thus, claim 2 merely requires that the passageways of claim 1 gradually get larger as they approach the exhaust.

---

[59] *Id.,* at p. 7, Figures 3A, 3B.

[60] '580 patent (Pospis Aff. Exh. E), at claim 2, col. 8:22-24; Joint Claim Construction Statement (Pospis Aff. Exh. M), at p. 9.

(ii) **The Japanese '699 Patent Discloses Each Limitation of Claim 2**

In addition to disclosing, as set forth above, each limitation of claim 1, the Japanese '699 patent additionally discloses each limitation of claim 2. That is, the cross-sectional areas of the air passageways of the Japanese '699 patent gradually expand as they approach the air outlets. Those passages are "inclined", and hence gradually get larger as they approach each outlet.[61]

2. **Double Patenting**

a. **Legal Standard – Double Patenting**

In *Eli Lilly and Co. v. Barr Laboratories, Inc.*, 251 F.3d 955 (Fed. Cir. 2001), the Federal Circuit explained that "[t]he judicially-created doctrine of obviousness-type double patenting ... prohibit[s] a party from obtaining an extension of the right to exclude through claims in a later patent that are not patentably distinct from claims in a commonly owned earlier patent." (*Eli Lilly*, 251 F.3d at 967.) "[T]he doctrine is necessary to prevent a patent term extension through claims in a second patent that are not patentably distinct from those in the first patent[.]" (*Id.*) Thus, its primary purpose is to "prevent unjustified timewise extension of the right to exclude granted by a patent no matter how the extension is brought about." (*Id.* at 968.)

"[A]n obviousness-type double patenting analysis entails two steps. First, as a matter of law, a court construes the claim in the earlier patent and the claim in the later patent and determines the differences. ... Second, the court determines whether the differences in subject matter between the two claims render the claims patentably distinct." (*Id.*) "A later patent claim is not patentably distinct from an earlier patent claim if the later claim is obvious over, or anticipated by, the earlier claim." (*Id.*; *see also, Geneva Pharmaceuticals, Inc. v.*

---

[61] Japanese '699 patent translation (Pospis Aff. Exh. U), at pp. 3, 4.

29

*GlaxoSmithKline, PLC*, 349 F.3d 1373, 1383 (Fed. Cir. 2003) ("A claim cannot be patentably distinct over anticipatory subject matter").)

Double patenting is a question of law. (*Georgia-Pacific Corp. v. United States Gypsum Co.*, 195 F.3d 1322, 1326 (Fed. Cir. 1999).)

### b. Claim 1 of the '580 Patent is Invalid Due to Obviousness-Type Double Patenting

Claim 1 of the '580 patent provides, in pertinent part, for air passageways sloping downward from the end of the working air fan towards the exhaust of the motor. Because claim 11 of the '843 patent discloses each limitation of (and hence anticipates) claim 1 of the '580 patent, claim 1 of the '580 patent is not patentably distinct from claim 11 of the '843 patent, and is hence invalid for obviousness-type double patenting.

The *preamble and first four paragraphs* of claim 1 of the '580 patent appear identically in claim 11 of the '843 patent.[62]

The *first clause of the fifth and final paragraph* of claim 1 of the '580 patent provides (with constructions underlined and substituted in place of the original claim language) that the "support structure at an end of the motor ha[s] a plurality of passageways that slope downward and outward away from said working air fan toward said at least one exhaust aperture." (*Supra*, at p. 24.) Claim 11 of the '843 patent discloses this limitation, as it provides (with constructions underlined and substituted in place of the original claim language) that the "support structure at an end of the motor has a downwardly slanted or angled area around the edge of a higher part connecting it to a lower part and each ... blade has an ending point, nearest the shroud extending radially along said slanted or angled area around the edge of a higher part connecting it to a

---

[62] *Compare,* the '580 patent (Pospis Aff. Exh. E), at claim 1, col. 8:2-14 *with* the '843 patent (Pospis Aff. Exh. D), at claim 11, col. 8:12-23.

30

lower part".[63] The air passageways of claim 11 of the '843 patent are formed by adjacent blades, and those passageways, which follow the contour of the downwardly sloping shoulder, necessarily slope downward. They likewise slope outward as well, because they "re-direct[]" the "air expelled by [the] working air fan ... toward said at least one exhaust aperture."[64]

The *second clause of the fifth and final paragraph* of claim 1 of the '580 patent provides (with constructions underlined and substituted in place of the original claim language) that "said passageways extend from an inner periphery in a proper state of adjustment or in a straight line position with the outer periphery of said working air fan toward an outer periphery of said support structure at an end of the motor." (*Supra,* at p. 24.) Claim 11 of the '843 patent necessarily discloses this feature. *First,* the passageways responsible for directing the exhausted air toward an exhaust aperture "extend from an inner periphery in a proper state of adjustment or in a straight line position with the outer periphery of [the] working air fan," to ensure that those passageways capture the exhausted working air. *Second,* those passageways "extend ... toward an outer periphery of [the] end bracket," to ensure that the working air fan is not in touching contact with the outer edge of the fan chamber. Indeed, claim 11 of the '843 patent specifically provides for an "inner periphery" and an "outer periphery", as it requires the presence of a "gathering chamber ... where the working air collects prior to exiting from" an exhaust aperture.[65] The "inner" and "outer" periphery are, respectively, the inner and outer boundaries of said gathering chamber.

---

[63] '843 patent (Pospis Aff. Exh. D), at claim 11, col. 8:29-31; Joint Claim Construction Statement (Pospis Aff. Exh. M), at pp. 6-7.

[64] '843 patent (Pospis Aff. Exh. D), at claim 11, col. 8:26-27.

[65] *Id.,* at claim 11, col. 8:32-34.

31

In sum, claim 1 of the '580 patent provides an improper temporal extension of the invention claimed in the '843 patent, and is hence invalid for double patenting. (*See, e.g., In re Lonardo*, 119 F.3d 960, 967 (Fed. Cir. 1997) (later patent claims were invalid for obviousness-type double patenting, where the earlier patent claimed an element with specificity, and the later claims defined it more generically).)

        c.    **Claim 2 of the '580 Patent is Invalid Due to Obviousness-Type Double Patenting**

Claim 2 incorporates all of the limitations of claim 1, and further adds that the "<u>passageways</u> gradually <u>get larger</u> as they <u>approach</u> at least one exhaust <u>opening</u>." (*Supra*, at p. 28.) Claim 20 of the '843 patent (which incorporates the limitations of claims 19 and 16), explicitly discloses this additional feature, as it provides that the "adjacent vanes form gradually expanding channels therebetween."[66] Claim 2 of the '580 patent is thus anticipated by, and is hence invalid due to double patenting in light of, claim 20 of the '843 patent.

---

[66] *Id.*, at claim 20, col. 10:28-29.