# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Johnson Electric Industrial Manufactory, Ltd. et al. </br></br>Plaintiffs </br>v. </br></br>Ametek, Inc. </br></br>Defendant | Civil Action No: 3:03CV0098AVC |

### AFFIDAVIT OF JAMES P. SHAWCROSS

I, James P. Shawcross, being first duly sworn, do hereby depose and say:

1. I am employed by Ametek, Inc. as Director of Application Engineering in its Motor Division.

2. I have a Doctor of Science (DSc) Degree in Mechanical Engineering from Washington University in St. Louis, Missouri.

3. For the past thirty (30) years, I have worked as a mechanical engineer, and my entire career has involved products requiring electric motors.

4. Since 1993, I have been intimately involved in the design and development of electric motors for various uses, and particularly for use in the floorcare industry.

5. I have been actively involved in the management of this case and have primarily interfaced with litigation counsel in its management.

6. Under the terms of a Patent License Agreement between Johnson and Ametek, dated July 30, 2001, Johnson received a license to manufacture through-flow motors under Ametek's patents 5,734,214 and 6,309,180, as well as at least the six (6) foreign equivalents at issue in this case. The '180 patent is a divisional of the '214 patent, and all of the foreign

**EXHIBIT A**

patents are equivalents of the '214 patent. Accordingly, all the patents have substantially the same specification and drawings, differing only, to the extent that they differ at all, in their claims.

7. Johnson's U66 and U82 bypass motors are accused in this case of infringing Ametek's patents 6,166,462, 6,439,843 and 6,695,580. No foreign patents or license agreements are at issue with regard to the by-pass motors.

8. Since this case commenced in January, 2003, the market for through-flow motors has become less significant to Ametek, and the market for by-pass motors more significant. I also understood that the case was becoming complicated by Johnson challenging the validity of foreign patents and Johnson's issuance of multiple expert reports. We were also assessing the case from a trial standpoint, and believed that the issues regarding the through-flow motors would overwhelm the issues regarding the by-pass motors and unnecessarily complicate the case for a jury. Accordingly, Ametek assessed the cost versus benefit implications of the through-flow motors and determined that the case would be better managed by removing the through-flow motor issues from the case, focusing on the by-pass motors of an increasing market.

9. Before this litigation commenced, Ametek and Johnson operated under the Patent License Agreement, mentioned above. Johnson paid royalties to Ametek on motors having the same type of ramp systems that they presently employ, and which they now contend are outside of the patents of the License Agreement. At a point in time prior to this litigation, Johnson submitted a redesign of its through-flow motor to Ametek and, following communications and a meeting between the parties, Ametek continued that the redesign

fell under the patents of the License Agreement. Immediately following that meeting, Johnson commenced this lawsuit.

10. As the case proceeded, I was fully aware of the accused Johnson motors and the Ametek patents and have consistently held the belief that the patents are infringed by the Johnson products.

11. At a point in time, Ametek considered that I would be used as a technical expert witness and Roger Smith, our company's Vice President Sales and Marketing, as a financial expert. Our depositions in that regard were set for February 15 and 16, 2006. Because of the schedules of Mr. Smith, our trial counsel, and myself, we were not able to confer until a day or two before the scheduled depositions. At that time, we determined that neither Mr. Smith nor myself would testify as experts, but as fact witnesses. I had already been deposed as a fact witness.

12. When Johnson commenced this action against Ametek, Ametek determined to oppose the action effectively, but conservatively, without spending any unnecessary money. Ametek is not a litigious company, but a very conservative one, and while it saw the need to defend its position and assert its patent and contract rights against a foreign competitor, it desired to do so in the most cost-effective manner possible. Indeed, had Johnson not brought this suit against Ametek, there is a good likelihood that no litigation would have ensued.

13. With regard to the prosecution of the '180 patent, at that point in time, Ametek believed that the portion of the walls extending beyond the motor flange impacted the motor's performance, and, depending on the design of the walls, they could impact

efficiency and noise. Subsequently, well after patent issuance, Ametek has determined that the portion of the walls beyond the flange have little effect on efficiency or noise.

Further, the Affiant sayeth naught.

*James P. Shawcross*
James P. Shawcross

County of Portage       )
                        )
State of Ohio           )

Sworn to and subscribed before me this 9th day of June, 2006.

*Melinda A. Hunter*

SEAL                    Notary Public       MELINDA A. HUNTER, Notary Public
                                            Residence - Portage County
                                            Statewide Jurisdiction, Ohio
                                            My Commission Expires 5-30-2011

- 4 -

# EXHIBIT B

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Johnson Electric Industrial Manufactory, Ltd. et al., | ) Civil Action No: 3:03CV0098AVC |
| Plaintiffs, | ) |
| v. | ) |
| Ametek, Inc., | ) |
| Defendant. | ) |

## AFFIDAVIT OF RAY L. WEBER

I, Ray L. Weber, being first duly sworn, do hereby depose and say:

1. I am an attorney in good standing before the bar of the State of Ohio, and have practiced intellectual property law continuously for nearly 34 years.

2. I am a Special Master for the United States District Court for the Northern District of Ohio in matters regarding intellectual property law.

3. I am lead counsel in this matter.

4. I have prosecuted numerous patent applications in foreign countries throughout the world in my 34 years of patent practice, and have further researched the law regarding the countries of Mexico, China, Hong Kong, Germany, Italy and Croatia, at issue in this case. Each one of those countries, as with virtually all other countries in the world, have proceedings by which the validity of a patent can be challenged. These proceedings are typically referred to as cancellation or nullity proceedings, and generally proceed through an administrative body in the country of interest. Any

**EXHIBIT B**

of the foreign patents brought into issue in this litigation by Johnson could have their validity nullified, if appropriate, in proceedings in the country of domicile of the patent in issue.

5. In assessing this case from the beginning, the infringements of the patents appeared clear and, as with virtually any patent case, it was only incumbent upon the plaintiff to prove infringement by a comparison of the properly construed patent claims to the accused products. Since the claims are fixed, and the nature of the accused products is fixed, the task was a rather simple one. I undertook the only discovery I deemed necessary - - interrogatories, document requests, and the deposition of Johnson's technical expert, its employee/consultant, Roger Baines.

6. At the close of fact discovery and the commencement of expert discovery, I assessed the need for expert testimony and determined that, to the extent any such testimony might be required, it could be provided by Dr. James Shawcross, an engineer and technical specialist for Ametek, and Roger Smith, its Vice President Sales and Marketing. Since they were not retained experts, no reports were required of them under the Federal Rules of Civil Procedure. But, out of an abundance of caution, I identified them as potential experts, although I advised Johnson's counsel repeatedly that they would likely not be called as expert witnesses, but only fact witnesses.

7. It was difficult to confer with Shawcross and Smith, since they both travel extensively for Ametek. I was able to confer with them shortly before their scheduled depositions, and confirm my belief that their testimony was of a factual nature and, on the first business day following my conference with Shawcross and Smith, I advised Mr. Weiss of that determination.

8. When I assessed the expert reports of Straus, Clark and Reyes advanced by Johnson, I determined that no response or deposition was necessary, because the infringement of at least

certain of the patents was clear, and it was my belief that this Court has no jurisdiction for determining the validity or invalidity of a foreign patent. Had Johnson desired to challenge the validity of those patents, the mechanism for doing so was through cancellation or nullity proceedings in the appropriate country - - particularly since the Patent License Agreement had no provision for assessing validity.

9. I also determined that the expert report of Thomas, an attorney himself, was nothing more than attorney argument and was unlikely to withstand a *Daubert* challenge. Since his contentions were primarily of a legal nature, I felt competent to handle them without an expert or taking his deposition.

10. The expert report of Baines was also deficient, and unlikely to withstand a *Daubert* challenge. But, to the extent he opined as to some very limited issues regarding infringement and invalidity of the U.S. patents directed to the by-pass motors, I took his deposition, but limited to his deficient report. I was particularly interested in Baines because he was a former Johnson employee, a present Johnson consultant, and a person with whom I had dealt in the past.

11. Upon receipt of the expert reports of Johnson, and being informed that the market for the through-flow motors was rapidly shrinking, it was determined to streamline the case by going forward only on the by-pass motors, eliminating the need for motion practice regarding the jurisdiction of this Court to rule on the validity of foreign patents, *Daubert* proceedings on five (5) expert reports, and the inherent complexity of the case which would otherwise involve five (5) U.S. patents, six (6) foreign patents, a Patent License Agreement, and at least three (3) motors of Johnson. As a consequence, we determined to pare the case to manageable issues, to streamline it for the jury.

# EXHIBIT C

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In the application of ) | Group Art Unit 3745 |
| GILLILAND et al. ) | N. Nguyen, Examiner |
| Serial No. 09/642,297 ) | Certificate of Mailing |
| Filed August 18, 2000 ) | I hereby certify that this correspondence was deposited with the United States Postal Service as first class mail in an envelope addressed to: Box NON-FEE AMENDMENT, Assistant Commissioner of Patents and Trademarks, Washington, D.C. 20231 on this 6th day of June, 2001. |
| For MOLDED THROUGH-FLOW MOTOR ASSEMBLY ) | |
| ) | Dorothy L. Carper, Sec'y to Andrew B. Morton |

## AMENDMENT

Assistant Commissioner for Patents

Washington, D.C. 20231

Sir:

In response to the Examiner's Office Action dated March 6, 2001, the following amendments and remarks are respectfully submitted in connection with the above-identified application.

<u>In the Specification</u>:

Please add the following paragraph before the paragraph beginning on page 6, line 22:

-- As best seen in Fig. 6, each curvilinear wall 77 terminates at an end 79 prior to reaching the shaft aperture 81. The ends 79 and the radial transition of the bearing holder 78 form a flow chamber 83 therebetween. The flow chamber 83 is contiguous with all the air chambers 76 and functions to collect and re-direct the air flow from a radial direction to an axial direction through the cup portion 19. --

**EXHIBIT C**

-1-

Application No.: 09/642,297
Attorney Docket No: 4570.5-CON2.DIV

In the Claims:

Please amend the claim as follows:

1  6.  (Amended) A diffuser plate for diffusing air from a fan, wherein the fan and the
2      diffuser plate are enclosed by a shroud, which has an air intake aperture, that is
3      coupled to a motor housing which has a generally cylindrical cup portion from which
4      extends a circumferential flange portion, the diffuser plate comprising:
5          a main body portion having a first side adjacent the fan, opposite a second side
6      adjacent the circumferential flange portion, said main body portion having a shaft
7      aperture extending therethrough;
8          a plurality of scallops disposed around an outer periphery of said first side, each
9      said scallop including a curved wall and a curvilinear ramp surface which terminates
10     at an air inlet aperture that extends through to said second side; and
11         a plurality of curvilinear walls extending from said second side to define air
12     chambers therebetween which are open to corresponding said air inlet apertures, each
13     said curvilinear wall extending from a corresponding curved wall toward, but
14     terminating prior to reaching said shaft aperture, and wherein said curvilinear walls
15     are separated apart and disconnected from each other.

Please add the following claims:

1  --9.  The diffuser plate according to claim 6, wherein each of the curvilinear walls has an
2       end, and wherein a flow chamber contiguous with said air chambers is formed
3       between said ends and said shaft aperture.

1  10.  A diffuser plate for diffusing air from a fan, wherein the fan and the diffuser plate are
2       enclosed by a shroud, which has an air intake aperture, that is coupled to a motor
3       housing which has a generally cylindrical cup portion from which extends a
4       circumferential flange portion, the diffuser plate comprising:
5           a main body portion having a first side adjacent the fan, opposite a second side
6       adjacent the circumferential flange portion, said main body portion having a shaft
7       aperture extending therethrough;

-2-

Application No.: 09/642,297
Attorney Docket No: 4570.5-CON2.DIV

curvilinear walls are separated apart and disconnected from each other. In other words, the curvilinear walls are not joined to one another by virtue of a corner or other structural feature that extends from the second side of the main body portion. This feature is clearly not taught or suggested by the Havens reference nor does any of the prior art made of record provide such a feature with all the other claimed elements. Therefore, it is requested that the rejection be withdrawn.

Basis for this claim amendment can be found in the specification and, in particular, at Fig. 6 which shows the claimed features. In order to clearly identify the ends 79 of the walls, the Applicants respectfully request entry of an amendment to the specification which details the particulars of Fig. 6. The ends of each curvilinear wall form a flow chamber 83 between the ends and the bearing holder 78. The flow chamber facilitates the efficient redirection of the airflow from a radial direction to an axial direction through the cup portion 19. A red-ink drawing showing the identifying numerals is submitted herewith for the Examiner's approval.

In view of the foregoing amendments to claim 6, it is respectfully submitted that it is allowable along with all the dependent claims. The Applicants also respectfully request entry of a new claim 9 which sets forth the features of the flow chamber between the ends of the curvilinear walls and the shaft aperture. Clearly, such a feature, along with all of the other claimed elements, is not taught or suggested in the art made of record. The Applicants also request entry and allowance of new independent claim 10. Claim 10 is much like claim 6 except for the recitation of the flow chamber being contiguous with the air chambers. Such a feature is clearly not present in Havens or the other art made of record.

The Applicants expressly acknowledge the other prior art made of record by the Examiner. The Applicants respectfully submit that none of the cited references, taken either singly or in combination, teaches or suggests the presently claimed invention.

Based upon the foregoing amendments and remarks submitted herewith, claims 6-10 are believed to be patentable and entry of a formal Notice of Allowance as to those claims is earnestly solicited.

Attached hereto is a marked-up version of the changes made to the application by this Amendment.